Richard NIXON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 80–3227.

United States District Court,
District of Columbia.

Dec. 13, 1991.

Herbert John Miller, R. Stan Mortenson, Washington, D.C., for plaintiff.

David Jay Anderson, Neil Koslowe, Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM

JOHN GARRETT PENN, District Judge.

The plaintiff, a former President of the United States, filed this action "for just compensation under the Presidential Recordings and Materials Act and for deprivation of constitutional rights of privacy, speech and association." In his complaint, he states that he seeks "just compensation for (i) defendant's depriving plaintiff of his materials, (ii) the costs incurred in connection with the statutory and regulatory procedures for determining title, ownership, custody, possession, control, and accessibility of plaintiff's materials, and (iii) defendant's depriving plaintiff of his constitutional rights of privacy, speech, and association." This case is filed pursuant to Section 105 of the Presidential Recordings and Materials Preservation Act (Act), 44 U.S.C. § 2111, Note.

Plaintiff was elected President of the United States in November 1968 and assumed that office in January 1969. He was reelected President in November 1972 and began his second term on January 20, 1973. He resigned from that office on August 9, 1974.

Plaintiff states that "[d]uring his terms as President, plaintiff and members of his staff maintained and generated, within the White House and other presidential offices, many of plaintiff's personal materials (including family and law practice records, memorabilia, correspondence, materials related to his personal and political activities, and other items), and a substantial amount of material pertaining to plaintiff's position as president (including documents, papers, tapes, photographs, notes, and other items) all of which shall hereinafter be referred to as plaintiff's 'materials.'" Complaint par. 6. The plaintiff states that "as was the case with every President of the United States preceding and succeeding him through January 19, 1981, plaintiff was the owner and lawful custodian of his materials." Complaint par. 7. He notes that "on September 3, 1974, the Attorney General of the United States rendered an opinion that plaintiff, like all other former presidents, was the owner of his materials." *Id.* He

further contends that by passage of the Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2207, Congress recognized that the materials of those Presidents whose terms in office were before January 20, 1981, were owned by those Presidents. He complains that based upon the Act, which was enacted on December 19, 1974, the defendant has retained custody and control of his materials and has deprived him of its exclusive use, enjoyment and disposition and that this action was undertaken by the defendant "without just compensation." He notes that as the result of the regulations promulgated pursuant to the Act, defendants have exposed and made available to various persons plaintiff's material against plaintiff's will, and that all of the above activities by the defendant deprived him of his constitutional rights.

The issue in this case is whether or not the materials, constitute the private property of the plaintiff and whether, under the Act, the defendant has deprived the plaintiff of that private property without just compensation.

The case is now before the Court on cross motions for summary judgment filed by the parties.[1]

## I

The plaintiff contends that the property that is the subject of this case are files covering a period of five and one-half years and tape recordings of plaintiff's activities spanning approximately two and one-half years of his life. The plaintiff does not claim ownership of institutional government files such as those of the National Security Council, the Office of Emergency Preparedness or other such divisions of the President's Executive Office.

Very briefly, the plaintiff alleges that when he assumed the Office of President, he discovered that his predecessor, Lyndon B. Johnson, had installed an elaborate taping system which was manually operated and which included microphones on telephones in the White House, Camp David, and the President's Offices in Johnson City and Austin, Texas. Although the plaintiff had determined that his activities at the White House would be the best chronicled in history, he nevertheless ordered the taping system removed. He chose instead to rely on his staff to prepare memoranda of every major meeting and event. The plaintiff found over a period of time that this alternative method proved cumbersome and ineffective and by February 1971, the plaintiff instructed his staff to reinstall a taping system. Rather than a manual system which would have depended upon the plaintiff arbitrarily selecting among conversations to record, the plaintiff chose a voice-activated system. He contends that as a result, from February 1971 until April 1973, virtually every conversation which occurred in the President's Offices in the White House, the Executive Office Building, the Cabinet Room, or on the telephones at Camp David and in the Lincoln Sitting Room was recorded, regardless of the persons involved or the subjects discussed. He notes that:

> It was my practice to discuss with my aides, other officials of government, members of Congress, representatives of different organizations, and private citizens, their opinions on such matters as the preparation of legislation, the signing or vetoing of enrolled bills, and even the commencement, continuation or termination of military action ... [S]uch discussions permitted me to explore the complete range of thoughts, opinions and options. For example, I would be able to elicit from my aides, Cabinet members, Congressmen and Senators, and others their feelings concerning not only the wisdom of a particular course of action, but their blunt assessments of possible ramifications upon foreign or domestic policy, as well as potential political effects.

App. 9. The plaintiff went on to explain:

> On occasion, for example, I would meet with a member of Congress who I counted also as a close personal friend. During such a meeting we might discuss matters pending before Congress, politi-

1. The parties attempted to settle this case without a ruling by the Court.

cal matters of interest to us both, or personal matters having to do with our families, our respective interests in business, or any other thing that was on our minds.

App. 15. He stated:

> [I]t was also my practice in my role as head of my political party to engage in extensive and frequent discussions with members of my staff, members of Congress, other officials of government, governors and state officials and personal friends and associates concerning a multitude of political matters.... Such discussions included, for example, whether I should support certain candidates for elected office and, if so, what form that support should take. In these discussions purely personal matters were often inextricably intermixed with political matters, and it would be virtually impossible to separate the various combinations of views and opinions expressed in them.

App. 11.

The plaintiff contends that the recorded conversations seized under the Act embody virtually every aspect of his daily life:

> From his concerned call to a missing congressman's wife, to his legislative strategy sessions with his staff; from his consideration of foreign policy initiatives, to his planning of weekend activities at Camp David; from his political brainstorming with party officials, to his telephone calls of condolences to families of prisoners of war. Every attitude, emotion, and privately expressed thought, every unguarded personal reference, and every confidential exchange of ideas have been captured on the recordings.

Plaintiff's Brief at 7.

The plaintiff notes that at the time he decided to record his conversations, he was aware that President Johnson had taken his tapes with him upon leaving office and "had treated them, along with all other White House files, as his private property." He notes that President Johnson had sent word to him that the tapes had been invaluable in preparing his memoirs and he contends that he had "an entirely reasonable expectation ... that his recordings would similarly be exclusively his to dispose of or use as he deemed appropriate."

## II

The plaintiff resigned the Presidency on August 9, 1974, and instructed his staff to have his files shipped to California. The Ford administration, in an attempt to clarify the legal status of the property, requested the Attorney General's opinion on the matter. An opinion from the Attorney General indicated that the former President owned the materials. The Attorney General did note a caveat that certain documents may be needed for continued use or be subject to national security protections. He further indicated that those interests could be protected "in full conformity with the theory of ownership on the part of the ex-president." Due to the demands by the Watergate Special Prosecutor, the Ford administration refused to release plaintiff's materials until the Special Prosecutor was assured access to those items which might have been important to his investigations. Then on September 6, 1974, the plaintiff signed an agreement with the Administrator of General Services, Mr. Sampson; this agreement is often referred to as the Nixon–Sampson Agreement. App. 52. The agreement provided in substance that the materials would be deposited with the Government under a joint control arrangement in a California facility owned by the Government, that the plaintiff would retain all legal and equitable title and ownership rights to the property, that the tapes would be destroyed upon plaintiff's death or ten years from the date of the agreement whichever occurred first and that access to the materials would occur only with the plaintiff's consent or through judicial process. When the Ford administration did not implement the agreement, the plaintiff brought suit in this court for specific enforcement. *See Nixon v. Sampson*, 437 F.Supp. 654 (D.D.C.1977), *rev'd*, 591 F.2d 944 (D.C.Cir.1978). It was while the above case was pending that Congress enacted the Act.

In seeking relief, the plaintiff contends (1) that "the historical record manifests a consistent recognition that Presidents own the Presidential materials created or accumulated during their respective administrations", (2) that "before the 1974 taking, plaintiff owned all the Presidential materials generated during his administration," (3) that "prior to the 1974 taking, the plaintiff had a distinct, constitutionally protected property right, in the form of a common law copyright in much of this Presidential material", (4) that "the Government seizure and permanent retention of the plaintiff's Presidential materials constituted a taking of his private property under the Fifth Amendment and under the 1974 Act" and (5) that "the 1974 Act took plaintiff's constitutionally protected property interests in the Nixon–Sampson agreement." On the other hand the defendant argues that the limited rights that the plaintiff possessed in the Presidential materials were not "property" that is compensable under the Fifth Amendment and that even if the plaintiff had limited rights in the Presidential material which are compensable "property", that the United States has not "taken" that "property". Finally, the defendant contends that the United States should not be required to pay "double" compensation for the putative "taking" of the Presidential historical materials and that the plaintiff has no "common law copyright".

### III

Before discussing the merits of this case, it is helpful to briefly review the history of Presidential papers.

When his administration ended, President Washington directed his staff to separate from his papers those which he wished to leave to his successor in office and to pack and send the remainder of the papers to Mount Vernon. Upon his death, he did not leave his Presidential materials to the Government but bequeathed them to his nephew, Bushrod Washington. In 1829, Bushrod Washington bequeathed the papers to his nephew, George Corbin Washington, and in 1833 the Secretary of State wrote to George Corbin Washington and advised him that he was interested in obtaining Washington's papers for the Archives of the United States. Washington agreed for a mutually satisfactory sum to transfer his title to the papers except for those of a private nature. There was much discussion as to the amount to be paid for those papers but in the end Congress appropriated $25,000 to be paid for the papers in question.

President Jefferson left his papers to his grandson as his executor, while "all others of a literary or other character [he gave] to him as of his own property." In 1848, Congress appropriated $20,000 to pay the grandson for all of the papers and manuscripts of Thomas Jefferson.

President Madison bequeathed to his wife "all my manuscript papers, having entire confidence in her discrete and proper use of them". In 1848, Congress, pursuant to an agreement between Dolly Madison and the Secretary of State, appropriated $25,000 to purchase those papers which had been the papers of James Madison.

In the case of President Monroe, he was in some financial trouble during his lifetime and apparently bequeathed his papers as his private property to his son-in-law, who was the executor of his estate, to arrange for their publication with the profits to be divided between his son-in-law and Monroe's daughters. The son-in-law petitioned Congress for financial aid in arranging for publication of the papers and Congress instead decided to purchase the Monroe papers for $20,000.

Later, the Manuscript Division of the Library of Congress was created in 1897 and since that time actively sought to acquire Presidential papers. Through this program, the Library acquired the papers of Presidents Polk, Lincoln, Andrew Johnson, Arthur, Cleveland, McKinley, Theodore Roosevelt, Taft, Wilson and Coolidge. But throughout this period, the treatment accorded to these documents was such as to lead to the impression that Congress treated the papers as the personal property of the Presidents.

It is clear that the collections of papers were treated differently by different Presi-

dents and their families. Some of those Presidential collections like those of John Adams and John Quincy Adams were well preserved by their family members. In other cases, such as in the cases of Harding and Coolidge, some of the papers were destroyed by members of their family apparently to avoid any embarrassment. The historical record seems to suggest that most Presidents sought to preserve some of their papers for the purpose of the Archives of the United States but that they or their designees made a determination as to which papers would be handed over to the Government, which papers would be passed on to the succeeding administration and, which papers would be destroyed or kept privately.

Finally, in 1938, President Franklin D. Roosevelt offered to "donate" his Presidential papers to the Government in exchange for the Government's maintaining at federal expense a public facility to be built with private funds; that facility to be located at Roosevelt's personal home at Hyde Park, New York. The plaintiff points out that when the President met with the Archivist of the United States, and was asked why the President's papers were "not within the class of official papers" Roosevelt is said to have responded "that following the precedents set by Washington all Presidents had regarded their Presidential files as their personal property and had always taken them from the White House at the expiration of their terms of office." *See* Extracts from R.D.W. Connor Journal (R.D.W. Connor Papers, Southern Historical Collection), Library of the University of North Carolina at Chapel Hill at 11. Mr. Connor reports that at one point the President pointed in the direction of the file room of the White House and stated "when I came to the White House there was not a scrap of paper in that room; when I retire I shall not leave a scrap. The room will be swept clean for my successor." *Id.* It is reported that a sponsor of the Roosevelt Library Bill, Congressman Keller, expressed an opinion that the Presidential materials were "private property." He noted "under the customs ... and under the law so far as we have enacted it,

the papers do not belong to the President and he has a perfect right to dispose of them to suit himself." *See* 84 Cong. Rec. 9047 (July 13, 1939). Professor Samuel Eliot Morrison wrote in response to Congress:

Q: Has the President the right to take his files away with him?

A: Yes. The White House has been cleared of every president's archives at the expiration of his term, or at his death, if he died in office; the files of his administration have been considered his personal property, to deal with as he and his heirs saw fit. And down to President Hoover's administration, the major part of the Presidential files were destroyed before leaving the White House.

84 Cong.Rec. 9046 (July 13, 1939). Congressman Sam Rayburn, who served as Speaker of the House, stated

Throughout American history Presidents retiring from office have removed from the White House all correspondence and documents addressed to them, because these papers and documents have always been considered personal property. After retirement some Chief Executives have totally destroyed such material; others have partially destroyed it, edited the remaining portion, and sold their collections; and still others have disposed of their papers in a manner making research and study of their collections impossible.

*Id.* at 9043.

In 1950, Congress passed the Federal Records Act, Pub.L. No. 81–754, 64 Stat. 583 (1950). The plaintiff notes that in Section 507 of the Federal Records Act, Congress provided that with respect to "the records of any federal agency or of Congress" materials of historical value would be acquired by the General Services Administration "provided, that the title to such records shall remain vested in the United States unless otherwise authorized by Congress." *See* Section 507(a)(2). Yet, with respect to "the personal papers and other personal historical documentary materials of the present president" and others, GSA was authorized to accept them for deposit

provided that "title to materials so deposited under this subsection *shall pass to and vest in* the United States." Section 507(e)(1) (emphasis added). In 1955, Congress passed the Presidential Libraries Act, Pub.L. No. 84–373, 69 Stat. 695 (1955).

The "gifts" of papers made by Hoover, Truman, Eisenhower, Kennedy, Johnson, Ford and Carter included certain reservations indicating that private property rights were being conveyed to the Government and in many cases the members of the family or the designees of the President carefully reserved for periods of time, the right to regain possession and title to property in their sole discretion to any materials deeded to the Government.

The suggestion that the past Presidents treated the papers as their personal property can be found in President Truman's treatment of his documents. In his case he kept his Presidential files in his personal possession at his offices in Missouri in order to review those papers preliminarily to depositing the papers under the provisions of the Federal Records Act. He did not deposit the papers until four years thereafter. President Ford provided in his agreement with the General Services Administration that if at any time the Government fails to observe all terms and conditions of his conveyance then possession of these materials would pass to the University of Michigan. In the case of Franklin D. Roosevelt, some of his "longhand letters" such as between himself and the King of England or others were retained by Roosevelt for his personal estate.

In the case of President Eisenhower, he provided in part for the gift of his papers as follows:

It is my purpose to make the papers and other documentary materials donated to the United States by the terms of this instrument available for purposes of serious research as soon as possible and to the fullest extent possible. However, since the President of the United States is the recipient of many confidences from others, and since the inviolability of such confidences is essential to the functioning of the office of the presidency, it will be necessary to withhold from public scrutiny certain papers and classes of papers for varying periods of time. In pursuance of this objective and in accordance with the provisions of Section 507(f)(3) of the Federal Property and Administrative Services Act of 1949, as amended, conditions are imposed on the use of my papers as provided [in the following paragraphs].

App. 458.

Included in those conditions were papers to be placed under seal which were security classified pursuant to law or Executive Orders, papers which might be prejudicial to the maintenance of good relations with foreign nationals, papers containing statements made by or to the President in confidence, papers relating to his family or private business affairs and papers relating to the families or private business affairs of persons who have had correspondence with him, papers containing statements about individuals which might be used to injure or harass them or members of their family or such other files as he or his representative or the Administrator of General Services may specify. He also provided that papers placed under seal shall not be made available to anyone or their contents divulged to anyone except certain persons as provided by his agreement.

When the John F. Kennedy papers were turned over to the Government to be placed in the Kennedy Library, it was provided in the document donating the papers to the Government that:

"The Donors shall have and specifically reserve the right to retain title and possession and to regain possession of any items that the Donors in their sole discretion may determine in accordance with this paragraph the Third are excluded from the purview of this gift, irrespective of the fact that such items may have been heretofore delivered to the Donee."

App. 474. The Kennedy "gift" also contained many of the restrictions set forth above in the Eisenhower "gift."

In making his "gift", President Johnson also provided for certain limitations and

restrictions on the use or viewing of the papers. He provided in part that:

I hereby reserve the right to restrict the use and availability of any Materials to which this agreement applies, irrespective of the time when such materials may have been, or may be delivered to the United States, for such time as I, in my sole discretion, may from time to time specify, and such restrictions shall be adhered to and observed in all respects for as long a period of time as may be specified or until such restrictions are revoked or terminated by me or persons authorized to act on my behalf with respect thereto, or as otherwise provided in this agreement.

App. 555.

Thus, as the brief discussion above outlines, it has been the custom to treat the papers of the President as his personal papers. This fact is made even more evident in the case of the "modern" Presidents such as Roosevelt, Truman, Eisenhower, Kennedy, Johnson, Nixon and Ford and all of these Presidents, while presumably transferring most of their papers to the Government, did so with express conditions that they maintain the right to select the papers that would be transferred and even after the gift had been made, to pull back documents that may have been transferred. In the case of President Johnson, shortly after his death, his former assistant, who had been given control of certain of his papers, noted that those papers in her possession were entrusted to her and when used by the President he would return those papers to her. She stated that when the President realized that he was close to death:

He instructed me on several occasions ... at least six times in 1972 and as late as the early part of 1973 that no one should have access to these documents. He especially made this point clear in early January 1973—the last time being around January 11, when he instructed me to make sure that if they were still in my possession at the time of his death, I was to turn them over to the LBJ Library with the instructions that none of the files I had in my possession were to

be opened for at least fifty years. He stated that in his opinion most of the documents should never be opened and should remain sealed. His instructions were very definite and unmistakable that the minimum time these papers should be closed was for fifty years. He repeated that if he died and I was still an employee, it was my responsibility to carry out his instructions.

App. 572–73

With this background in mind, the Court now considers the claims in this case.

## IV

Beginning from the time of the first President, George Washington, the treatment of the Presidential papers suggests that the papers have always been considered to be the personal papers of the President to save, dispose of or treat as he saw fit. It was President Washington who placed certain papers in the hands of his successor and stored the remainder of the papers in his home at Mount Vernon. The defendant argues that Washington's action was an "unwitting precedent" and was done largely because there was no appropriate depository for his papers within the federal government. This argument appears to be borne out by the first President's comments about the importance of his papers. Washington is said to have remarked on one occasion that no adequate history could be written without access to his papers. When he took the remainder of his papers to Mount Vernon it was his intention to construct a facility "for the [s]ecurity of papers of a public nature". *See* letter from George Washington to Secretary of Treasury, in Cook, Private Papers of Public Officials, American Archivist, July 1975, Defendant Exhibit 23 at 306. For whatever reason, his plans to build a facility for the storage of his papers were never fulfilled and those papers passed to his nephew.

The treatment of such papers by some of the succeeding Presidents has already been mentioned and need not be restated. While the treatment would suggest that the pa-

pers were looked upon as private property, that history must be viewed in the context of the times. There simply was no depository for such papers in the fledgling nation. But almost all of those early Presidents appeared to realize that their papers were a part of the history and fabric of this nation.

It also cannot be overlooked that while at least some of the Presidents may have considered some or all of the papers to be their property; from almost the very beginning, Congress recognized that the papers were important to the nation and began to appropriate funds to purchase the papers of the early Presidents. Thus to argue, as does the plaintiff, that there was a "consistent recognition" that the Presidential materials created during their respective administrations belonged to the President is not an entirely accurate statement of historical fact.

In what might be loosely described as the second stage in the handling of Presidential materials, the Library of Congress became involved in collecting the papers of the later Presidents and thus, the papers of Polk, Lincoln, Andrew Johnson, Arthur, Cleveland, McKinley, Theodore Roosevelt, Taft, Wilson and Coolidge were acquired.

Finally, the Presidential library system was established. While it's true that all the Presidents or their designees or heirs exercised considerable discretion over the papers to be released to the library, such action is not necessarily in conflict with the proposition that the papers did not belong to the President. Everyone recognized that highly personal or sensitive papers should not be released and that the persons who were in the best position to make a judgment as to whether papers were personal or sensitive would be the President or his designee. In their "donations" to their respective libraries, Presidents Roosevelt, Eisenhower, Johnson, Ford and Carter, expressed understandable concern over the release of certain papers. The same concern was expressed by the family of John F. Kennedy. But the Court does not view this reservation of rights to maintain control over certain papers or to provide that

they may not be made public before the passage of a number of years as being inconsistent with the public's entitlement to those papers.

In short, the so-called "modern" Presidents, beginning with President Roosevelt appeared to recognize that, if they had "legal title" to the Presidential papers, it was title in the nature of a trustee holding those papers in trust for the American people and for history. None of these Presidents, or even the earlier Presidents, appeared to take the position that the papers and materials were theirs to dispose of in any manner that they saw fit.

To argue that these materials were the sole property of the President, although they were created only because the person was serving as President, were clearly tied to his actions and the decisions made while he served as President, were created on Government machinery or through government personnel, and which related to the office of the President, simply is without merit. As noted, ownership there may be, but an ownership no greater than as a trustee for the American people.

In *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court was called upon to decide the constitutionality of the Act. In concluding that the Act was constitutional, the Supreme Court did not purport to address the issue of the ownership of these very materials, but some of the language of the High Court is no less instructive. The Supreme Court stated:

We see no reason to engage in the debate whether appellant [this plaintiff] has legal title to the materials.... Such an inquiry is irrelevant for present purposes because § 105(c) assures appellant of just compensation if his economic interests are invaded, and, even if legal title is his, *the materials are not thereby immune from regulation.* It has been accepted at least since Mr. Justice Story's opinion in *Folsom v. Marsh, 9 Fed. Cas. No. 4,902,* pp. 342, 347 (CC Mass. 1841), that regardless of where legal title lies, "from the nature of the public service, or the character of documents, em-

bracing historical, military, or diplomatic information, *it may be the right, and even the duty, of the government, to give them publicity, even against the will of the writers."* Appellant's suggestion that the *Folsom* principle does not go beyond materials concerning national security and current Government business is negated by Mr. Justice Story's emphasis that it also extended to materials *"embracing historical ... information."* Ibid. (Emphasis added.) Significantly, no such limitation was suggested in the Attorney General's opinion to President Ford. Although indicating a view that the materials belonged to appellant, the opinion acknowledged that "Presidential materials" without qualification "are peculiarly affected by a public interest" which may justify subjecting "the absolute ownership rights" to certain "limitations directly related to the character of the documents as records of government activity." 43 Op.Atty.Gen. No. 1 (1974), App. 220–230.

On the other hand, even if legal title rests in the Government, appellant is not thereby foreclosed from asserting under § 105(a) a claim for return of private materials retained by the Administrator in contravention of appellant's rights and privileges as specified in § 104(a)(5).

433 U.S. at 445, n. 8, 97 S.Ct. at 2791 (n. 8) (emphasis this Court's).

The above decision does not support a claim that the plaintiff has or ever had an absolute right to dispose of the papers. The opinion recognizes the American people do have a right to the papers—a fact seemingly recognized by every President. Indeed, the record reflects that this plaintiff, after he completed his term as Vice President, turned his Vice Presidential papers over to the Government.

Viewing the materials in the above light, this Court cannot find that the plaintiff has demonstrated that he has absolute title or an absolute property right in the material. As the Government has argued, any right the plaintiff has to the materials is at best limited. This Court agrees. This being the case, the Court must conclude that there

has been no "taking" under the constitution or under the Act. Moreover, the Court cannot discern that the Presidential materials are compensable property. Those materials are the property of the American people subject to some control by the plaintiff. Of course, the plaintiff, as the Act recognizes, has absolute control and ownership over the materials which are strictly personal to him, his family or friends. But in the case of the Presidential materials, the plaintiff's title is no greater than as a trustee for the American people.

Assuming for the moment, that the plaintiff does have title or a property interest in the materials, the Court must still conclude that there has not been a "taking". Plaintiff places heavy reliance on *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In that case the Supreme Court concluded that a cable installation which occupied a very limited portion of appellant's roof was nevertheless a "taking". Plaintiff argues that pursuant to *Loretto,* the fact that the Government has exclusive legal custody and possession and control of the materials has resulted in a *per se* taking notwithstanding the plaintiff's "visitation rights". This Court cannot agree. The Presidential papers are unique, and it is difficult to compare those papers with any other property. In any event, it seems clearly recognized that the American people have an interest in those papers no matter the status of legal title. At least this much is recognized by the Supreme Court. *See Nixon v. Administrator of General Services,* 433 U.S. at 445, n. 8, 97 S.Ct. at 3791, n. 8. This being the case, it is possible for the Government to exercise some control over the maintenance and disposition of those materials. Thus assuming that the plaintiff has legal title to the materials, a conclusion that this Court does not reach, the Act amounts to nothing more than a regulation restricting the use or disposition of the property, rather than a "taking" of the property. *See Loretto,* 458 U.S. at 430, 102 S.Ct. at 3173.

The Court also finds that any argument that the Nixon—Sampson agreement allowed the plaintiff to establish a right is

also without merit. Congress voided the Nixon—Sampson agreement because the plaintiff could have removed those materials from consideration by the Special Prosecutor.

In sum, the Court concludes that the plaintiff does not have legal title to the materials in question, and that the plaintiff only held those materials as a trustee for the American people. There has been no "taking" of his property in the constitutional sense or under the Act. In view of the above, it follows that the plaintiff's motion for summary judgment must be denied and the defendants motion for summary judgment must be granted and that this case must be dismissed with prejudice.