978 F.2d 1269
 298 U.S.App.D.C. 249, 61 USLW 2325
 Richard NIXON, Appellant,
v.
UNITED STATES of America, Appellee.
 No. 92-5021.
 United States Court of Appeals,
 District of Columbia Circuit.
Argued Sept. 14, 1992.
Decided Nov. 17, 1992.
 
 [298 U.S.App.D.C. 250] Appeal from the United States District Court for the District of Columbia (No. 80-3227).
 Martin D. Minsker, with whom Herbert J. Miller, Jr., R. Stan Mortenson and Scott L. Nelson, Washington, D.C., were on the brief, for appellant.
 Neil H. Koslowe, Sp. Litigation Counsel, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and David J. Anderson, Director, and John L. Jacobus, Washington, D.C., were on the brief, for appellee.
 Before: EDWARDS, RUTH BADER GINSBURG and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 Concurring opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 In 1974, Congress passed the Presidential Recordings and Materials Preservation Act ("PRMPA" or "the Act"), which severely restricted former President Nixon's rights to his presidential papers.[1] Alleging that PRMPA constituted a taking, Mr. Nixon sued for just compensation under the Takings Clause of the Fifth Amendment.[2] The District Court held that Mr. Nixon held his presidential papers as "a trustee for the American People" and, therefore, he had no compensable property interest in these materials. In the alternative, the District Court held that, even if the papers belonged to Mr. Nixon personally, PRMPA was a permissible use regulation rather than a "taking." Mr. Nixon appeals from these determinations.
 
 
 2
 Upon reviewing the long and unbroken history relating to the use, control, and disposition of presidential papers, we are convinced that Mr. Nixon had a well grounded expectation of ownership. In the light of this history, we hold that Mr. Nixon, like every President before him, had a compensable property interest in his presidential papers. Moreover, since PRMPA effectively destroyed the most essential attributes of ownership, it constituted a per se taking of that property requiring the constitutionally mandated remedy of just compensation. We therefore reverse and remand for a determination of the compensation due.
 
 I. BACKGROUND
 A. Factual Background
 
 3
 Between January 20, 1969, and August 9, 1974, the White House Office[3] accumulated a mass of documents, tape recordings, and other materials related to the Presidency of Richard M. Nixon. These materials--which we hereinafter refer to in shorthand as "the presidential papers"--contained information and communications covering official, political, and personal matters. The presidential papers that were collected in these files included correspondence of the President and his staff, reports relating to the political activities of the Office, copies [298 U.S.App.D.C. 251] of documents pertaining to the executive branch departments, the President's telephone logs, and drafts of speeches prepared by the President or his staff.[4] The tape recordings in the files were the product of an internal voice activated system[5] that recorded conversations made in the White House and Executive Office Building, the Cabinet Room, the Lincoln Sitting Room, and those made on the telephones at Camp David. Thus, the presidential papers contain an exhaustive personal, political, and official record of the presidency of Richard Nixon.[6]
 
 
 4
 Following his resignation on August 9, 1974, Mr. Nixon arranged to have his presidential papers removed to California. However, before they could be shipped, Philip W. Buchen, Counsel to President Ford, learned that the Watergate Special Prosecutor had a continuing interest in the materials. Thinking that the Ford Administration might have some responsibility with respect to the files, Mr. Buchen delayed their shipment and inquired of Attorney General William Saxbe regarding them. In response, the Attorney General issued a formal opinion in which he concluded that the materials were owned by Mr. Nixon, but that the government, as custodian, was obliged to respond to subpoenas or other court orders covering the files. 43 Op.Att'y Gen. 7, 9 (1974).
 
 
 5
 After receiving the Attorney General's opinion, Mr. Buchen sought to reach some compromise arrangement to deal with the competing claims to the presidential papers. Following consultations with Mr. Nixon's counsel and President Ford, an agreement was entered into in which Mr. Nixon agreed to deposit all of his presidential papers with the Administrator of General Services, Arthur F. Sampson, for a temporary period, after which certain of the materials would be donated permanently to the United States.[7] The agreement guaranteed the full integrity and completeness of the materials so that valid legal process might be satisfied. With that exception, Mr. Nixon retained title to his papers and the right to exclude others from viewing or using the materials while they were in government custody pursuant to the agreement.
 
 
 6
 Concerned that, despite the Nixon-Sampson agreement, Mr. Nixon might destroy documents necessary to the Watergate investigation, Congress passed the Presidential Records and Materials Preservation Act of 1974, note following 44 U.S.C. § 2111 (1988). The Act effectively abrogated the Nixon-Sampson Agreement and authorized the Administrator of General Services[8] to retain "complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials that constitute the presidential historical materials of Richard M. Nixon." PRMPA § 101(b)(1).[9] The Act also provided for the Administrator to receive and retain possession of the White House tapes. PRMPA § 101(a). The Act further provided that none of the presidential papers could be destroyed, that access to the [298 U.S.App.D.C. 252] materials was to be regulated by the Administrator, that federal agencies and departments (along with Mr. Nixon) were to have regulated access to the materials at all times, and that the Administrator was to promulgate regulations[10] providing for public access to the materials. PRMPA §§ 102-04. Finally, the Act mandated that just compensation was to be paid to any person held to have been deprived by its provisions of private property. PRMPA § 105(c).
 
 
 7
 Regulations issued pursuant to the Act restrict access to the presidential papers that would disclose trade secrets, constitute a clearly unwarranted invasion of privacy or libel of a living person, or interfere with the administration of justice. 36 C.F.R. § 1275.52(b) (1992). In addition, the regulations provide that materials not of general historical significance[11] are to be returned to Mr. Nixon. 36 C.F.R. § 1275.48 (1992). If the Archivist intends to make any portion of the materials public, the regulations provide that any interested party (including Mr. Nixon) may object on a claim of legal right or privilege. 36 C.F.R. § 1275.44 (1992). Resolution of such claims by the Archivist is subject to judicial review for abuse of discretion. See Public Citizen v. Burke, 843 F.2d 1473 (D.C.Cir.1988).
 
 B. Litigation Background
 
 8
 This regulatory and statutory scheme has resulted in a series of cases in which Mr. Nixon has challenged the government's control and disposition of his presidential papers. In October, 1974, Mr. Nixon brought suit in which he sought to enforce the terms of the Nixon-Sampson agreement. See Nixon v. Sampson, 389 F.Supp. 107 (D.D.C.1975).[12] While Sampson was pending, PRMPA was passed by Congress and signed by President Ford. Section 105(a) of the Act bestows exclusive jurisdiction on the United States District Court for the District of Columbia over any challenge "to the legal or constitutional validity of this title or of any regulations issued under the authority granted by this title, and any action or proceeding involving the question of title, ownership, custody, possession, or control" of the materials. The day after [298 U.S.App.D.C. 253] the Act became law, Mr. Nixon filed a second suit in the District Court challenging the facial constitutionality of the Act. Nixon v. Administrator of General Services, No. 74-1852 (D.D.C. filed Dec. 20, 1974). In his prayer for relief, Mr. Nixon sought, inter alia, an injunction against enforcement of the Act and just compensation in the event the court found that PRMPA deprived him of private property. Id. Complaint at 34, reprinted in Appellee's Supp. Appendix at 12. Based on his claim for injunctive relief, Mr. Nixon moved for the convention of a three-judge district court under former 28 U.S.C. § 2282 (repealed).
 
 
 9
 This second law suit was initially assigned to the District Judge already presiding in Sampson, which was then nearing its conclusion. The District Judge, already burdened with Mr. Nixon's suit to enforce the Nixon-Sampson agreement, delayed ruling on Mr. Nixon's motions in the new proceeding until the earlier case could be concluded. Having failed to get the District Judge to initiate the statutory procedure leading to the formation of a district court of three judges, Mr. Nixon applied to this court for a writ of mandamus compelling the District Judge to act immediately on the pending motions. See Nixon v. Richey, 513 F.2d 427 (D.C.Cir.1975) ("Richey I "). Although this court did not issue a formal writ, we concluded that the Act mandated immediate consideration of any facial challenge to its validity and that, therefore, the District Court should rule on Mr. Nixon's application for a three-judge court before ruling on the merits in Sampson. Id. at 429-30. Our opinion and order were issued at approximately 9:45 a.m. on January 31, 1975 and, in accordance with standard expedited procedure, the District Judge was immediately notified of the opinion by telephone. Copies of the opinion were hand delivered to his chambers later that morning. Yet, at 11:00 a.m. the same day, the District Judge issued an opinion in Sampson in which he concluded, in part, that the presidential papers were not Mr. Nixon's personal property. Sampson, 389 F.Supp. at 133-45.
 
 
 10
 To protect the integrity of our earlier order and to ensure that the statutory framework for challenges was properly respected, this court entered an order staying further proceedings in Sampson, thus preventing the District Judge from entering a final order implementing his opinion. See Nixon v. Richey, 513 F.2d 430 (D.C.Cir.1975) ("Richey II "). We noted in that case that it was for the three-judge court, if one were to be convened, to decide in the first instance whether it had jurisdiction over the various claims and whether it should adjudicate the facial challenge to the Act prior to the final resolution of Sampson. Id. at 448.
 
 
 11
 In early 1975, a three-judge district court was convened,[13] and it immediately asked the parties to brief the jurisdictional and priority questions that we raised in Richey II. Nixon v. Administrator, No. 74-1852 (D.D.C. Feb. 20, 1975), reprinted in Appellee's Supp. Appendix at 90. On May 1, 1975, the three-judge court issued an order in which it noted its jurisdiction and concluded that our stay of Sampson should not be lifted prior to the resolution of the issues before it. Nixon v. Administrator, No. 74-1852 (D.D.C. May 1, 1975), reprinted in Appellee's Supp. Appendix at 117. In fixing its jurisdiction, the three-judge court concluded that it should consider only the claim for injunctive relief based on the statute's alleged unconstitutionality. Id. This conclusion was consistent with our determination in both Richey I and Richey II that the Act envisioned the resolution of facial challenges to its constitutionality prior to the disposition of other claims regarding Mr. Nixon's presidential materials, including just compensation claims. Richey I, 513 F.2d at 429; Richey II, 513 F.2d at 444-45. The three-judge court's perceived jurisdictional limit was an express assumption underlying its final opinion in the case. Nixon v. Administrator, 408 F.Supp. at 335 ("[W]e restrict our review ... to consideration [298 U.S.App.D.C. 254] of the propriety of injunctive relief against the alleged facial unconstitutionality of the statute."). Indeed, the question raised in the present appeal was reserved by that court. Id. at 355 n. 49 ("[I]n so far as the materials are Mr. Nixon's personal property, they are subject to condemnation under the eminent domain power, and Congress has provided in § 105(c) compensation for any taking of private property that may be effected."). As for the issue that was before it, the three-judge court considered a variety of asserted constitutional infirmities and upheld the Act in its entirety. Id. at 329-30.
 
 
 12
 Mr. Nixon appealed directly to the Supreme Court, which, in addition to affirming on the merits,[14] approved of the three-judge court's jurisdictional decision to limit its consideration to the facial constitutionality of the Act. Nixon v. Administrator, 433 U.S. at 439, 97 S.Ct. at 2788. Like the three-judge court below, the Supreme Court was careful to acknowledge that the takings question was not before it and remained open for resolution at some later date. Id. at 445 n. 8, 97 S.Ct. at 2791 n. 8. ("We see no reason to engage in the debate whether appellant has legal title to the materials. Such an inquiry is irrelevant for present purposes because § 105(c) assures [Mr. Nixon] of just compensation if his economic interests are invaded....") (citation omitted). Thus, neither the three-judge court nor the Supreme Court considered the disposition of Nixon v. Administrator as having any preclusive effect on the Takings Clause issues raised in the present appeal. Rather, both of those courts, in harmony with our own holdings in the Richey opinions, considered the resolution of the facial challenge to the Act's constitutionality an antecedent question, pending the resolution of which all other claims were necessarily suspended.[15]
 
 
 13
 Within two months of the Supreme Court's decision in Nixon v. Administrator, Mr. Nixon brought a second lawsuit against the Administrator of General Services challenging the Act's implementing regulations. See Nixon v. Freeman, 670 F.2d 346 (D.C.Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982). In that case, Mr. Nixon attacked the archival processing of the materials, asserting that the Act as implemented violated his privacy rights. The ownership of presidential papers was not material to that dispute. Conversely, the issues decided in Freeman were not relevant to the ownership of the materials. Since such divergent considerations obtained, Mr. Nixon did not raise the Takings Clause claim in Freeman, nor did he name the United States, the only entity that can grant relief on such a claim, as a party defendant. So limited, the District Court upheld the regulations and we affirmed. See Freeman, 670 F.2d at 348.
 
 
 14
 On December 17, 1980, prior to the conclusion of the Freeman litigation, Mr. Nixon brought this action for just compensation[16] under the Takings Clause, claiming that PRMPA constituted a taking of his [298 U.S.App.D.C. 255] property rights in his presidential papers or, in the alternative, a taking of his contract rights under the Nixon-Sampson agreement. On cross motions for summary judgment, the District Court entered judgment in favor of the United States and dismissed the action with prejudice. To reach this conclusion, the District Court held that the Presidents' rights in presidential papers are no greater than that of "a trustee for the American people." Nixon v. United States, 782 F.Supp. 634, 642 (D.D.C.1991). Therefore, the District Court concluded that Mr. Nixon did not have a compensable property interest in his presidential papers. Id. In the alternative, the District Court held that, even if Mr. Nixon did have a property interest, "the Act amounts to nothing more than a regulation restricting the use or disposition of the property rather than a 'taking' of the property." Id. Mindful that this appeal from the District Court comes to us from a grant of summary judgment, we must affirm the District Court's order only if there are no genuine issues of material fact and the United States was entitled to judgment as a matter of law. See FED.R.CIV.P. 56(c). We review de novo the legal conclusions of the District Court. Liberty Lobby, Inc. v. Rees, 852 F.2d 595, 598 (D.C.Cir.1988), cert. denied, 489 U.S. 1010, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989).
 
 II. THE MERITS
 
 15
 The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without paying the former owner just compensation. The application of the Takings Clause to this case requires that the court determine whether Mr. Nixon had any compensable property interest and, if so, whether PRMPA resulted in a "taking" of it.
 
 
 16
 What this case does not involve is a new review of the constitutionality of PRMPA. In Nixon v. Administrator, the Supreme Court decided that question, holding that the Act was a constitutional exercise of Congressional power pursuant to a valid public interest. However, the Court in that case did not answer the questions presented by this appeal. Indeed, it is fundamental that the Constitution requires compensation even where the conversion of private property for public use is based on a weighty public interest. See, e.g., United States v. Gettysburg E.R. Co., 160 U.S. 668, 16 S.Ct. 427, 40 L.Ed. 576 (1896). Therefore, we proceed to determine whether Mr. Nixon is entitled to "just compensation" as a result of the deprivations that he suffered by virtue of the enactment of PRMPA and its implementing regulations.
 
 A. Property
 
 17
 As an initial matter, this court must determine whether Mr. Nixon had a property interest that warrants protection under the Fifth Amendment. While the precise contours of the term "property" are not well delineated,[17] it is settled law that the Constitution does not create property interests. Rather, "property" is a creature of independent origins. Lucas v. South Carolina Coastal Council, --- U.S. ----, ----, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Tarpeh-Doe v. United States, 904 F.2d 719, 723 (D.C.Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). The essential character of property is that it is made up of mutually reinforcing understandings that are sufficiently well grounded to support a claim of entitlement. See Kaiser Aetna v. United States, 444 U.S. 164, 179, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) (property consists of recognized expectancies); Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (property involves mutually explicit understandings); Hall v. Ford, 856 F.2d 255, 265 (D.C.Cir.1988) (property is an expectation based on [298 U.S.App.D.C. 256] rules or understandings). These mutually reinforcing understandings can arise in myriad ways. For instance, state law may create entitlements through express or implied agreements, see, e.g., Kaiser Aetna, 444 U.S. at 179, 100 S.Ct. at 393; Roth, 408 U.S. at 577-78, 92 S.Ct. at 2709; Perry v. Sindermann, 408 U.S. at 602, 92 S.Ct. at 2700 ("rules and understandings" that justified a legal entitlement); and property interests also may be created or reinforced through uniform custom and practice, United States v. Arredondo, 31 U.S. (6 Pet.) 691, 714, 8 L.Ed. 547 (1832) ("There is [a] source of law in all governments, usage, custom, which is always presumed to have been adopted with the consent of those who may be affected by it.").[18]
 
 
 18
 Mr. Nixon's position in this case is that Presidents have, since the beginning of the Republic, treated their presidential papers as private property, creating mutually explicit understandings sufficient to engender a property interest through custom and usage. When confronted with the historical practice, the District Court concluded that previous Presidents were merely acting as custodians of what are essentially public records. Nixon v. United States, 782 F.Supp. at 642. The Government appears to have embraced this position on appeal. We reject it because it is flatly at odds with the historical record upon which it purports to rely.
 
 1. Employee Papers and the Common Law
 
 19
 The Government points the court to various decisions that it claims establish, as "common law," the proposition that an employer--including the government--owns the papers its employees create or maintain in the course of employment. There is no reason why this "common law," the Government next asserts, should not apply to Mr. Nixon. Even the President, the Government recalls, is not above the law. Mr. Nixon responds that the case law reflects a more modest proposition: an employer owns only those papers its employees are under a specific, express legal duty to maintain or create. By all accounts, before the Presidential Records Act of 1978, 44 U.S.C. §§ 2201 et seq., Presidents were never subject to any such specific, express legal duty to create or maintain their papers.
 
 
 20
 We need not decide this debate over the content of the "common law" and the application of that law to the President. It is enough to note that precedent on point is hardly crystalline. Because we find no clear or clearly applicable "common law" rule, we hold that the robust tradition of private ownership here--recognized explicitly by Congress--controls.
 
 
 21
 Under the circumstances of this case, in which we find no directly controlling constitutional, statutory or common law requirements with respect to the presidential papers, we here look to history, custom and usage to determine the ownership of the Nixon papers. The Government does not disagree that this is the proper avenue of inquiry; however, it does insist that history, custom and usage indicate that both the American public and the President have [298 U.S.App.D.C. 257] interests in the materials and that PRMPA recognizes and protects those interests. We disagree. As described below, the clear import of the historical practice is completely at odds with the Government's view.
 
 
 22
 2. History, Custom and Practice--The Presidents' Treatment of Their White House Papers
 
 
 23
 History, custom, and usage indicate unequivocally that, prior to PRMPA, Presidents exercised complete dominion and control over their presidential papers.[19] It is uncontroverted that every President before and after President Nixon assumed control of his presidential ("White House") papers upon departing office.[20] This tradition began when President Washington removed his presidential papers to Mount Vernon following his second term. Larry Berman, The Evolution and Value of Presidential Libraries, in THE PRESIDENCY AND INFORMATION POLICY 80 (Harold C. Relyea ed., 1981). By all accounts, this practice continued through both the nineteenth and twentieth centuries.[21]
 
 
 24
 The practice of presidential removal of White House papers was dramatically portrayed by President Franklin Roosevelt, who, waving his hand in the direction of the White House file room, exclaimed, "[w]hen I came to the White House there was not a scrap of paper in that room; when I retire I shall not leave a scrap. The room will be swept clean for my successor." R.D.W. Connor, 2 JOURNAL 11 (Southern Historical Collection, Library of the University of North Carolina at Chapel Hill), reprinted in Joint Appendix ("J.A.") at 453. When asked whether the White House papers were not official papers of the government, President Roosevelt noted that every President since Washington had "regarded their presidential files as their personal property and had always taken them from the White House at the expiration of their terms of office." Id.
 
 
 25
 Likewise, President Eisenhower's son attested that:
 
 
 26
 [When] my father arrived in the White House on January 20, 1953, the prior administration had removed from the White House and Executive Office Building offices all staff and central files pertaining to the work of that administration. My father informed me that the only material left for him was a single page of instructions to be used in the event of a national crisis and National Security Policy Documents.
 
 
 27
 Affidavit of John S.D. Eisenhower at 4 (June 30, 1975), reprinted in J.A. at 503.
 
 
 28
 The foregoing incidents, along with the many others described in the APPENDIX, demonstrate that the historical record is uncontestable on at least one point--every President (or his surviving heir or designated representative), both before and after Mr. Nixon, assumed control of his presidential papers upon leaving office. The United States cannot, and does not, dispute this facet of the historical tradition. Rather, the Government maintains that past Presidents took their papers only for lack of an adequate public repository, and that each regarded his possession of the presidential papers as merely custodial for the true owners--the American Public. This interpretation flies in the face of the historical record, common understanding, and the apparent acquiescence and ratification of Congress.
 
 
 29
 Beginning with George Washington, Presidents of the United States have, without [298 U.S.App.D.C. 258] notable exception, treated their presidential papers as personal property and have acted in ways inconsistent with the view that they regarded themselves as "trustees for the American people." For instance, after President Washington removed his papers to Mount Vernon, he did not make arrangements for public access to them or donate them to the government. Instead, he ensured that they would pass by descent within his family by bequeathing them to his nephew, Mr. Justice Bushrod Washington. WILLS OF THE UNITED STATES PRESIDENTS 23 (Herbert R. Collins & David B. Weaver eds., 1976) (text of the will of George Washington) (hereinafter "WILLS"). Likewise, Presidents Jefferson, Madison and Monroe passed their papers by testamentary gift. Id. at 40 (will of Thomas Jefferson), 45 (will of James Madison), 51 (will of James Monroe). Indeed, of the first thirty men to hold office, thirteen of them made specific bequests of their papers. HANDLING OF PRESIDENTIAL RECORDS: HISTORICAL AND CURRENT PRACTICE, Appendix 10, unpublished study, National Study Commission on Records and Documents of Federal Officials 3, reprinted in J.A. at 929. (hereinafter "HANDLING OF PRESIDENTIAL RECORDS"). In bequeathing these materials, the Presidents were not providing for trustee-like care, but were conveying valuable personal property in the expectation that their legatees would benefit.[22]
 
 
 30
 Similarly, some of the Presidents made outright gifts of their papers. See, e.g., Letter from President Jackson to Amos Kendall (May 20, 1845), quoted in INDEX TO PRESIDENTIAL PAPERS OF ANDREW JACKSON at v) (giving his papers to Francis Blair[23]); Letter from President Theodore Roosevelt to Herbert Putnam, Librarian of Congress (Dec. 5, 1916) (offering presidential papers to the Library on condition that no one else see them until after President Roosevelt's death), reprinted in J.A. at 368; Letter from Roosevelt to Putnam (Dec. 27, 1916) (consummating the deal), reprinted in J.A. at 373.
 
 
 31
 Arrangements providing for conditional gifts to the Library of Congress evolved into the modern practice of exchanging presidential papers not only for conditions on use and access, but also for the care and maintenance of a Presidential Library. The first of these exchanges was arranged by Franklin Roosevelt, who negotiated a deal with Congress in which he gave his White House materials to the United States on condition that the United States maintain them in a library to be built on Roosevelt's estate at Hyde Park, New York.[24] A proponent of the deal in Congress emphasized the President's ownership of the materials:
 
 
 32
 These are not public papers. They are the private property of Franklin D. Roosevelt, as papers of this sort have been the private property of every President of the United States. He could sell them, of course, for a fancy sum. They would be scattered to the four winds and no student who visited any one part of the United States would ever have an opportunity to see them.
 
 
 33
 84 CONG.REC. 6628 (June 5, 1939) (statement of Representative Rayburn). The practice was followed by later Presidents subject to the Presidential Libraries Act, Pub.L. No. 84-373, 69 Stat. 695 et seq. (1955) (empowering Administrator of General Services to accept and maintain Presidential Libraries) (discussed more fully infra). See, e.g., Letter from President Lyndon Johnson to Lawson B. Knott, Jr., Administrator of General Services (Aug. 13, 1965) (offering the Johnson papers in exchange for a Presidential Library), reprinted in J.A. at 697; Letter from President Carter to Robert Warner, Archivist of the United States (Jan. 31, 1981) (similar offer), reprinted in J.A. at 755. Every President from Franklin [298 U.S.App.D.C. 259] Roosevelt through Jimmy Carter, with the exception of Richard Nixon, has so donated his papers to the United States in exchange for a publicly supported Presidential Library. While a Presidential Library may seem a small price, and one that the United States would incur in any event were the materials public property in the first place, the reality is that Presidents have been able to use real leverage in negotiating with respect to the disposition of presidential papers to extract from the United States "fancy sums" in the form of lucrative library deals, while maintaining essential control over the materials.[25]
 
 
 34
 The incidents of Presidents disposing of their papers by gift or devise are clear examples of conduct inconsistent with public ownership. Even more vivid, however, are the numerous examples of Presidents willfully and intentionally destroying their presidential papers. One of the earliest examples is provided by President Van Buren, who destroyed a substantial part of his presidential correspondence while he was yet in office. HANDLING OF PRESIDENTIAL RECORDS at 16. Similarly, President Garfield is said to have destroyed many of his personal and political records between the time he was struck by an assassin's bullet on July 2, 1881, and the day he finally succumbed on September 19, 1881. Id. at 16. When the Library of Congress began making inquiries regarding the papers of President Chester Arthur, the President's son wrote the Library saying, "where the papers [are] is a mystery." Letter from Chester Arthur Jr. to Gaillard Hunt, Chief of Manuscript Division, Library of Congress (Mar. 13, 1915), quoted in Index to the Presidential Papers of Chester Arthur. The mystery was solved some years later when the President's grandson responded to continuing inquiries by the Library. As reported by Chester Arthur III, his grandfather had "caused to be burned three large garbage cans, each at least four feet high, full of papers which I am sure would have thrown much light on history." Letter from Chester Arthur III to Thomas P. Martin, Chief of Manuscripts Division (Apr. 15, 1938), reprinted in J.A. at 351.
 
 
 35
 Presidents Grant, Pierce, and Coolidge[26] also had significant numbers of their papers destroyed. See Resume of Presidential Papers: Hearings on H.J.Res. 330, 331, and H.J.Res. 332, Before the Executive and Legislative Reorganization Subcomm., 84th Cong., 1st Sess. 41-42 (1955) (hereinafter "Resume of Presidential Papers "). Indeed, in delivering a message to the Senate, President Cleveland expressly asserted his right to destroy White House papers:
 
 
 36
 I regard the papers and documents ... addressed to me or intended for my use and action purely unofficial and private, not infrequently confidential, and having reference to the performance of a duty exclusively mine. I consider them in no proper sense as ... the files of the Department, but as deposited there for my convenience, remaining still completely under my control. I suppose if I desired [298 U.S.App.D.C. 260] to take them into my custody I might do so with entire propriety, and if I saw fit to destroy them no one could complain.
 
 
 37
 8 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 1787-1897 (J. Richardson ed., 1900) 378 (Letter from President Cleveland to the United States Senate (Mar. 1, 1886)).[27] These sentiments, quite obviously, are inconsistent with the fiduciary duties of a trustee, and, in conjunction with the reported incidents of actual destruction of presidential papers, flatly contradict the notion that the Presidents considered the American people the beneficiaries of this material.
 
 
 38
 In short, every past President has treated these materials as private papers to hold, give away, withhold from others, transfer for consideration or bequeath as he saw fit. A concise summary of this practice is provided by President and later Chief Justice Taft:
 
 
 39
 The office of the President is not a recording office. The vast amount of correspondence that goes through it, signed either by the President or his secretaries, does not become the property or a record of the government, unless it goes on to the official files of the department to which it may be addressed. The retiring President takes with him all the correspondence, original and copies, which he carried on during his administration. Thus there is lost to public record some of the most interesting documents of governmental origin bearing on the history of an administration. It is a little like what Mr. Charles Francis Adams told me of the diplomatic records of the British Foreign Office. It has long been the custom for the important Ambassadors of Great Britain to carry on a personal correspondence with the Secretary of State for Foreign Affairs, which is not put upon the files of the department, but which gives a much more accurate and detailed account of the diplomatic relations of Great Britain than the official files. The only way in which historians can get at this, is through the good offices of the families of the deceased Ambassadors and Foreign Secretaries in whose private files they may be preserved.
 
 
 40
 W.H. TAFT, OUR CHIEF MAGISTRATE AND HIS POWERS 34 (1916).
 
 
 41
 3. History, Custom and Practice--Common Understanding
 
 
 42
 Presidential treatment of White House papers as private property has long been recognized and accepted by government officers and other constitutional office-holders confronted with the issue. For instance, over one hundred and fifty years ago, another Article III court had an opportunity to consider the question in a case concerning the descent and disposition of President Washington's papers. See Folsom v. Marsh, 9 F.Cas. 342 (C.C.D.Mass.1841). After acquiring the President's papers by testamentary gift, Justice Bushrod Washington entered into an agreement with Chief Justice Marshall and an editor named Jared Sparks for the publication of a biography detailing the life and times of our first President. Mr. Sparks proceeded to complete and publish a twelve volume history of President Washington's career. Later, a competing publication that borrowed heavily from the earlier work came into print, and a copyright fight ensued. The argument made in defense of the later history was that source documents consisting of President Washington's papers, upon which both of the works were based, were public property and, therefore, not copyrightable. Mr. Justice Story, sitting as Circuit Justice, resolved the conflict in favor of Justice Washington's assignees. Id. at 345. In the course of his opinion, Justice Story had occasion to discuss President Washington's view of the issue at some length, writing:[298 U.S.App.D.C. 261] [I]t is most manifest, that President Washington deemed them his own private property, and bequeathed them to his nephew.... That President Washington, therefore, intended them exclusively for public use, as a donation to the public, or did not esteem them of value as his own private property, appears to me to be a proposition, completely disproved by the evidence.
 
 
 43
 Id. Although Justice Story did add in dicta that a private copyright in these materials might be overcome by public exigencies requiring publication, the threshold determination that the ownership of the materials remained in President Washington's legatee and his assignees went undisturbed.
 
 
 44
 The understanding articulated in Justice Story's opinion has also been shared by officers of the executive branch. In the nineteenth century, a curious sequence of events brought the question of title to presidential papers again to the fore. Upon his death on June 28, 1836, President Madison's papers descended to his widow, Dolley Madison. WILLS at 45. In 1848, the estate having been dissipated, Mrs. Madison, nearly destitute, arranged to sell "all of the unpublished manuscript papers of the said James Madison now belonging to and in her possession" to the United States for $25,000. See Act of May 31, 1848, 30th Cong., 1st Sess., IX Stat. 235, Ch. 52 (appropriating $25,000 for the purchase); see also WILLS at 48 (Dolley Madison's financial condition tenuous). After the conveyance was complete, it became apparent that Mrs. Madison had withheld a significant portion of the President's materials. Mrs. Madison explained in a letter to the Secretary of State that she construed the terms of the purchase to comprehend only those papers written by the President himself. OFFICIAL OPINIONS OF THE ATTORNEYS GENERAL 104-08 (C.C. Andrews ed. 1856) (Opinion of Attorney General Caleb Cushing, Apr. 14, 1855). The materials that she retained, consisting primarily of correspondence written to the President, she bequeathed to her son, Payne Todd, who ultimately sold the papers to Mr. James C. McGuire. Id. By 1855, Congress still had not been able to acquire the balance of the Madison papers; so it inquired of the Attorney General whether there was some way the United States might assert legal title to the materials. Id. In his formal opinion, Attorney General Caleb Cushing concluded that the contract with Dolley Madison was valid, that its terms had been specifically fulfilled and that legal title rested in Mr. McGuire--the United States having no prior claim[28] to the papers. Id. Thus frustrated, Congress allowed the Library of Congress to purchase the remainder of the Madison papers. Resume of Presidential Papers at 39.
 
 
 45
 Finally, individual members of Congress have confirmed the common understanding that Presidents own their presidential papers. In hearings held preceding the passage of the Presidential Libraries Act of 1955, Representative Joseph Martin (through James Milne, administrative assistant) argued in support of the legislation, saying:
 
 
 46
 [T]he Office of the Presidency, like the offices of the Members of Congress and the Supreme Court, are constitutional offices, having separate and independent status in our governmental system, and that every President since George Washington has considered that this separate and independent status of the Office extends to and embraces the papers of the incumbent of the Office. Thus, as is the case with the papers of individual Members of Congress, the papers of the President have always been considered to be their personal property, both during their incumbency and afterward.
 
 
 47
 This has the sanction of law and custom, and has never been authoritatively challenged.
 
 
 48
 Hearings on H.J.Res. 330, 331, and H.J.Res. 332, Before the Executive and Legislative Reorganization Subcomm., 84th Cong., 1st Sess. 12-13 (1955). Later, [298 U.S.App.D.C. 262] Representative McCormack repeated this language verbatim in his own statement for the record. Id. at 58-59. Other members of Congress, although not taking the matter up specifically, assumed presidential ownership as a premise for the legislation. See, e.g., id. at 23 (Representative Jonas asking whether it would not be prudent to ensure that title to the documents pass to the United States upon dedication of each Presidential Library so that future heirs of the Presidents might not remove the documents); id. at 26 (Representative Moss discussing the difficulties of acquiring title to the materials of already deceased Presidents); cf. 84 CONG.REC. 6628 (June 5, 1939) (statement of Representative Rayburn quoted supra ).
 
 
 49
 4. History, Custom and Practice--Congressional Affirmation of Presidential Ownership
 
 
 50
 From all of the above, we cannot help but conclude that presidential ownership of White House papers has been widely assumed by members of all three branches of government. Indeed, the record on this score is sufficiently clear for us to conclude that, through mutually explicit understandings and uniform custom, Presidents retained an exclusive property interest in their presidential papers. But the story does not end here, for there is also evidence that Congress itself has acquiesced in this tradition.
 
 
 51
 Once again, we begin by retracing history to the practices of the nineteenth century. Although Presidents had been removing their papers upon departing from office since the end of the eighteenth century, Congress did not make a serious effort to preserve the historical record contained in these documents until almost forty years after President Washington retired when it appropriated $25,000 for the purchase of President Washington's papers.[29] Act of June 30, 1834, 23d Cong., 1st Sess., IV Stat. 712, Ch. 129. As the nineteenth century progressed, Congress was able to purchase the papers of Jefferson, Act of Aug. 12, 1848, 30th Cong., 1st Sess., IX Stat. 284, Ch. 166 ($20,000), Madison, Act of May 31, 1848, 30th Cong., 1st Sess., IX Stat. 235, Ch. 52 ($25,000) and Monroe, Act of March 3, 1849, 30th Cong., 2d Sess., IX Stat. 370, Ch. 100 (general appropriations rider to purchase of papers from Monroe's legatee, Samuel Gouverneur for $20,000). The fact that Congress saw fit to purchase these materials clearly indicates that there was a substantial property interest worth purchasing. An insubstantial trustee-like interest in the materials could much more easily and cheaply have been accommodated if Congress had simply taken possession of the papers and provided some limited access to the President so that he might ensure the continued integrity of the materials--much like PRMPA. But no nineteenth century Congress enacted PRMPA; rather, Congress routinely bargained for and purchased presidential papers for "fancy sums."
 
 
 52
 By the advent of the twentieth century, the Library of Congress was given the responsibility of collecting and purchasing presidential papers. Among the acquisitions made by this institution were the papers of Presidents Polk, Andrew Johnson, Jackson, and Arthur. See Draft Letter from Acting Librarian of Congress to Mrs. George W. Fall (Dec. 1, 1903) (offering her $10,000 for the Polk papers), reprinted in J.A. at 325; Affidavit of John C. Broderick, Assistant Librarian for Research Services at the Library of Congress at 10 (Sept. 7, 1984) (discussing the acquisition of the Andrew Johnson materials), reprinted in J.A. at 272; Resume of Presidential Papers at 40 ($18,000 paid for the Jackson papers); Letter from L. Quincy [298 U.S.App.D.C. 263] Mumford, Librarian of Congress to Chester Arthur III (July 8, 1958) ($7,500 for the papers not destroyed by President Arthur), reprinted in J.A. at 355. The Library of Congress also managed to acquire several sets of presidential materials from the heirs of deceased Presidents through outright gift. However, many of these gifts came with restrictions attached to them limiting access to, or the use of, the papers. See, e.g., Internal Memorandum, Acting Librarian of Congress Charles Moore (May 7, 1919) (papers of Abraham Lincoln deposited on the condition that (1) the Library's possession of them was to remain secret; (2) they were to be organized under the direction of Mr. Robert Todd Lincoln; and (3) access to them was to be allowed only by permission of Mr. Lincoln), reprinted in J.A. at 333; Letter from George B. Cortelyou, executor of the McKinley estate to Worthington Ford, Chief of the Manuscript Division, Library of Congress (Mar. 25, 1905) (papers of William McKinley offered pursuant to similar restrictions), reprinted in J.A. at 360. Significantly, Congress never disapproved of the Library's practice of purchasing presidential papers or accepting them as gifts subject to conditions. Indeed, by statute, Congress ratified the practice by mandating that the Library of Congress comply with any restriction placed on deposited presidential papers. See Pub.L. No. 85-147, 71 Stat. 368 (1957).[30]
 
 
 53
 Congress again implicitly recognized presidential ownership of these materials when it passed the Federal Records Act ("FRA"). Pub.L. No. 81-754, 64 Stat. 583 (1950) (codified as amended in scattered sections of 44 U.S.C.). In this legislation, Congress distinguished between presidential papers and other government records. While the FRA made it clear that Congress regarded the ownership of agency records to be in the United States, it specifically excepted presidential materials for different treatment. The FRA authorized the Administrator of General Services to "accept for deposit ... the personal papers and other personal historical documentary materials of the present President of the United States [and] his successors," subject to access restrictions imposed by the donor, not to exceed "the lifetime of the depositor or for a period not to exceed twenty five years, whichever was longer." FRA § 507(e). The FRA also stated that, upon donation to the government, "title to materials so deposited under this subsection shall pass to and vest in the United States." Id.
 
 
 54
 Subsequently, the Presidential Libraries Act of 1955 removed the twenty-five year time limit on access restrictions to which the government would agree and also deleted the requirement that title to the deposited materials pass to the United States. Pub.L. No. 84-373, 69 Stat. 695 (1955) (codified as amended at 44 U.S.C. §§ 2111-2112). The Presidential Libraries Act gave the Administrator the power to make whatever deal was necessary to gain permanent possession and control of presidential materials. As Attorney General Saxbe pointed out, the Presidential Libraries Act:
 
 
 55
 constitutes clear legislative acknowledgement that a President has title to all the documents and historical materials--whether personal or official--which accumulate in the White House Office during his incumbency.
 
 
 56
 43 Op. Att'y Gen. 3 (1974); see also Letter from Russel B Staats, Comptroller General, to Senator Joseph Montoya, Chairman, Subcomm. on Treasury, Postal Service and General Government 14 (Sept. 20, 1974) (same), reprinted in J.A. at 553.[31][298 U.S.App.D.C. 264] 5. Conclusion
 
 
 57
 In sum, the District Court's "public trust" notion is antithetical to the history of presidential papers. History, custom, and usage--relating to former Presidents and to those dealing with former Presidents--indicate unequivocally that presidential papers have been treated as the President's private property. This custom and usage evidences the kind of mutually explicit understandings that are encompassed within the constitutional notion of "property" protected by the Fifth Amendment. Thus, at the time when PRMPA was passed, President Nixon's presidential papers were exclusively the property of the President.
 
 B. The Taking
 
 58
 Since we have determined that Mr. Nixon has a compensable property interest in his presidential papers, the question that must follow is whether PRMPA constituted a taking of that property. On this point, the District Court held that, even if Mr. Nixon had a property interest in his presidential papers, there was no taking pursuant to PRMPA. Nixon v. United States, 782 F.Supp. at 642. The District Court reasoned that the American people have an interest in the papers and that, therefore, the government is entitled to exercise "some control over the maintenance and disposition of those materials." Id. Thus, the District Court concluded that PRMPA was nothing more than permissible regulation respecting the use of these materials rather than a "taking" of the property.
 
 
 59
 The District Court's judgment cannot withstand scrutiny. The government has, pursuant to PRMPA, taken complete possession and control of the Nixon papers. Although a great public interest may justify a taking, it does not convert the taking into mere regulation. Here, the few rights that Mr. Nixon retains in the materials are so fractured that his original property interest has been destroyed. Indeed, the rights that have been granted to Mr. Nixon are so modest that they cannot be equated with "property." In such a case, we have little difficulty in concluding that PRMPA constitutes a per se taking of Mr. Nixon's property.
 
 1. The Per Se Takings Doctrine
 
 60
 Where the government authorizes a physical occupation of property, or actually takes title, the Takings Clause requires compensation. Yee v. Escondido, --- U.S. ----, ----, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868 (1982); National Wildlife Fed'n v. Interstate Commerce Comm'n, 850 F.2d 694, 706 (D.C.Cir.1988). The rationale for the per se rule is that actual occupation of property obviates an in-depth factual inquiry to determine whether one's economic interests have been sufficiently damaged as to warrant compensation.
 
 
 61
 The Government argues that the per se takings doctrine applies only to the physical occupation of real property. This argument fails for want of authority or logic. First, to support its proposition that the per se takings doctrine does not apply to personal property, the Government reiterates the Supreme Court's oft-repeated admonition that the holding of Loretto is a narrow one. See, e.g., Loretto, 458 U.S. at 441, 102 S.Ct. at 3179; Yee, --- U.S. at ----, 112 S.Ct. at 1534; FCC v. Florida Power Corp., 480 U.S. 245, 251, 107 S.Ct. 1107, 1111, 94 L.Ed.2d 282 (1987). While this is indisputably true, the actual holding of Loretto makes no mention of a distinction between real and personal property, nor was any rationale given in the opinion that might justify such a distinction. See 458 U.S. at 441, 102 S.Ct. at 3179 ("Our holding today is very narrow. We affirm the traditional rule that a permanent physical invasion of property is a taking."). Subsequent Supreme Court cases have reaffirmed the per se doctrine without mention of any such distinction. See, e.g., Florida Power Corp., 480 U.S. at 252, 107 [298 U.S.App.D.C. 265] S.Ct. at 1112 (defining the category of cases to which the per se doctrine applies as those where a seizure of property involves "required acquiescence" to a permanent invasion of the property). In short, the narrowness of the Supreme Court's holding in Loretto does not address the Government's contention; it advances that argument not at all.
 
 
 62
 Second, the Government places great emphasis on the fact that the Court has not applied the per se doctrine in a case involving personal property.[32] The Court has in dicta, however, expressly included personal property within the category of property that might be subject to per se taking. See United States v. Sperry Corp., 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989) (distinguishing between money, which is not subject to the per se doctrine because it is fungible, and "real or personal property"). Indeed, in Loretto the Court based the per se takings rationale on a passage from Professor Michelman's seminal article on takings:
 
 
 63
 "The one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly use', or 'permanently' occupy, space or a thing which theretofore was understood to be under private ownership."
 
 
 64
 458 U.S. at 427 n. 5, 102 S.Ct. at 3171 n. 5 (quoting Michelman, supra note 17, at 1184). Under Michelman's construct, "thing" encompasses "any discrete, identifiable (even if incorporeal) vehicle of economic value which one can conceive of as being owned." Michelman, supra note 17, at 1184 n. 37. Hence, the Government's inference that the per se doctrine must be limited to real property is without basis in the law, and we see no reason to give it one. One may be just as permanently and completely dispossessed of personal property as of real property. Any distinction along these lines would be purely artificial.
 
 2. The Taking of Mr. Nixon's Property
 
 65
 Given that the per se doctrine applies to this type of property, Mr. Nixon argues that PRMPA constitutes a per se taking since the Act has authorized the Archivist of the United States to assume "complete possession and control" of Mr. Nixon's presidential papers. PRMPA § 101. Moreover, Mr. Nixon points out that PRMPA denies him the power to unilaterally dispose of the materials as he wishes or to exclude others from them. PRMPA §§ 102, 104. The Government counters that the Act did not dispossess Mr. Nixon of the materials, but merely continued a pattern of access that was implemented by Mr. Nixon himself: the materials were left in the White House when Mr. Nixon resigned his Presidency; they were to remain in the custody of the Administrator pursuant to the Nixon-Sampson agreement; there had always been widespread access to them during the Nixon administration; and PRMPA's implementing regulations allow Mr. Nixon supervised access to them as well as the means of objecting to access tentatively granted others by the Archivist. 36 C.F.R. § 1275.26 (1992). Thus, the Government argues, PRMPA does not fundamentally alter Mr. Nixon's interest in the materials and cannot, therefore, constitute a taking. Again, the Government asks this court to indulge in the fantastic.
 
 
 66
 First, the Act unambiguously provides for federal possession of the materials. PRMPA § 101. Although it is true that Mr. Nixon may still view and use the documents,[33] that fact is hardly dispositive. The retention of some access rights by the former owner of property does not preclude the finding of a per se taking. See Lucas, --- U.S. at ----, 112 S.Ct. at 2895[298 U.S.App.D.C. 266] (taking where owner allowed to keep land, but prohibited from any economic use of the land); Nollan v. California Coastal Comm'n, 483 U.S. 825, 831-32, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677 (1987) (taking found where owner granted a building permit for beachfront property conditioned upon the creation of a public easement across the property). The test must be whether the access rights preserve for the former owner the essential economic use of the surrendered property. That is, has the former owner been deprived of a definable unit of economic interests? If so, then it is no answer that he may still stand in some relation to the property. In the present case, the right of access retained by Mr. Nixon is but a thin reed among those associated with the ownership of presidential papers. Although he may still use them, presumably for his own autobiographical and historical work, he has lost all bargaining power with respect to them, not to mention the ability to dispose of them.
 
 
 67
 More importantly, PRMPA has completely abrogated Mr. Nixon's right unilaterally to exclude others from the materials. As the Court has confirmed time and time again, the right to exclude others is perhaps the quintessential property right. Kaiser Aetna, 444 U.S. at 176, 100 S.Ct. at 391; Loretto, 458 U.S. at 433, 102 S.Ct. at 3175; Hodel v. Irving, 481 U.S. 704, 716, 107 S.Ct. 2076, 2083, 95 L.Ed.2d 668 (1987). Without this right, one's interest in property becomes very tenuous since it is then subject to the whim of others--an interest more akin to a license than to ownership. The Government attempts to circumvent this difficulty by referring us to the widespread access to the materials given to the White House staff during the Nixon administration. The Government reasons that Mr. Nixon cannot be injured by allowing others to view the documents since so many have viewed them in the past. This approach, however, completely misapprehends the distinction between regulation affecting one's relationship to those voluntarily admitted to property versus government action compelling an owner to allow continuous access to third parties. Compare Yee, --- U.S. at ----, 112 S.Ct. at 1530-31 (regulation of the relationship between landlord and tenants voluntarily admitted to the property not a per se taking) with Loretto, 458 U.S. at 436, 102 S.Ct. at 3176 (per se taking where landlord required to admit a cable company to her property). In the first case, the owner may terminate the permissive use, thus reclaiming sole dominion over the property. That is not to say that this action will always be costless, but it remains, at least, an option. In the latter case, that option has been taken--the owner can do nothing to avoid the unsolicited invasion. So it is in this case. Mr. Nixon may not prevent any person to whom the Archivist grants access from viewing or using the materials. In this way, he has been deprived of perhaps the paramount property right.
 
 
 68
 The Government persists, though, arguing that, under PRMPA § 104(a)(5) and its implementing regulations, Mr. Nixon has mechanisms available to him to exclude others. Yet, even a cursory review of these sections makes it apparent that they in no way approach the at will power to exclude others that all property owners enjoy and expect. Under the regulations, Mr. Nixon must be given notice and an opportunity to be present at any search of the materials by federal agencies or in connection with judicial process. 36 C.F.R. § 1275.26(d). Moreover, Mr. Nixon must be notified prior to the release of materials to an agency or in connection with judicial proceedings, or prior to the opening of any integral file segment of the materials to public access. 36 C.F.R. § 1275.26(f). If he has any objection to the release based on "rights or privileges," Mr. Nixon may file a claim with the Archivist and obtain a temporary stay of the release pending an administrative determination. Id. This determination is subject to judicial review. However, in substance, these privileges are not materially different from the privileges enjoyed by other members of the public with respect to these same materials. See 36 C.F.R. § 1275.42(b) (30-day notice prior to public release); id. at § 1275.44(a) (right to assert a claim to block release based on right or privilege). Thus, Mr. Nixon actually [298 U.S.App.D.C. 267] retains no "right" to exclude others from this property; and certainly not one capable of being called a property interest.
 
 
 69
 Similarly unavailing are the Government's references to Mr. Nixon's abandonment of the materials upon his departure from Washington and his subsequent acceptance of the Nixon-Sampson agreement. First, nothing can be inferred from Mr. Nixon's having left the materials in the White House. In view of the volume of the materials (42 million items), Mr. Nixon did what he could to ensure that they would find their way to his California destination by arranging with his staff for the organization and shipment of the materials. Mr. Nixon's having left without them is in no way remarkable. Second, the Nixon-Sampson agreement does not reflect an acquiescence to complete dispossession of the materials. Indeed, the purpose of the agreement was apparently just the opposite: to ensure that valid judicial process could be satisfied by the new administration without Mr. Nixon having to relinquish title and control of his papers. The agreement was for a limited duration and it authorized Mr. Nixon to exclude unilaterally anyone from access other than those acting pursuant to a subpoena. The inference from this conduct that Mr. Nixon willingly engendered the PRMPA construct is simply too great of a logical leap.
 
 
 70
 In conclusion, PRMPA not only physically dispossessed Mr. Nixon of his property, but it also severely restricted his right of access to the property, his right to exclude others from the property, and his right to dispose of the property. Therefore, under the per se doctrine, PRMPA resulted in a "taking" and compensation is constitutionally required.
 
 III. CONCLUSION
 
 71
 By virtue of mutually explicit understandings arising from a tradition of presidential ownership of White House papers, Mr. Nixon acquired a property interest in his presidential papers. PRMPA, which unquestionably denies Mr. Nixon the most important attributes of property ownership, effected a per se taking of that property. Thus, the constitutional remedy of just compensation is required and this case must be remanded to the District Court for a determination of compensation due. In remanding to the District Court, we recognize that difficult questions regarding the measure of damages remain. Those questions, though, were not before this court, and we leave them for the District Court to address in the first instance.
 
 
 72
 So Ordered.
 
 APPENDIX:
 THE HISTORY OF PRESIDENTIAL PAPERS
 1. PRESIDENT WASHINGTON:
 
 73
 President Washington's presidential papers are comprised of approximately 35,000 documents, 95% of which are currently housed in the Library of Congress. Resume of Presidential Papers at 30. The President initially removed his papers from the White House following his term of office and stored them in his home in Mount Vernon, Virginia. He originally planned to build a permanent storage facility for them, but, before completing it, he passed away. Berman, supra, at 80.
 
 
 74
 In his will, President Washington devised his presidential papers to his nephew, Justice Bushrod Washington, to whom they passed upon his death. WILLS at 23. Mr. Justice Washington did not manifest great concern for the integrity of the collection. He generously complied with requests for autographs and memorabilia by sending out documents in the President's own hand. INDEX TO PRESIDENTIAL PAPERS OF GEORGE WASHINGTON at ix-x. For instance, upon request, he sent all of the President's correspondence with the Marquis de Lafayette to the Marquis in Europe. Id. See generally THE LETTERS OF LAFAYETTE TO WASHINGTON, 1777-1799 (Louis Gottschalk ed. 1944). In 1827, Mr. Justice Washington entered into an agreement to have portions of the papers published along with a biography of his Uncle. INDEX TO PRESIDENTIAL PAPERS OF GEORGE WASHINGTON at ix-x.
 
 
 75
 On Bushrod's death, the majority of Washington's presidential papers passed to Congressman George C. Washington, who transferred the papers from Mount Vernon to his office in Georgetown. Id. at xiii. In 1834, Congressman Washington sold most of the papers in his possession to the United States for $25,000. Act of June 30, 1834, 23d Cong., 1st Sess., IV Stat. 712, Ch. 129. He sold the balance of the materials to the United States in 1849. Act of March 3, 1849, 30th Cong., 2d Sess., IX Stat. 370, Ch. 100.
 
 2. PRESIDENT JOHN ADAMS:
 
 76
 John Adams, a serious scholar and record keeper, had a fireproof library built at his family residence to store his presidential papers, where they remained until long after his death on July 4, 1826. See Lyman H. Butterfield, The Papers of the Adams Family: Some Account of Their History, LXXI PROCEEDINGS OF THE MASSACHUSETTS HISTORICAL SOCIETY 335 (1959). In 1905, the family transferred the collection to the Massachusetts Historical Society, to which the papers were conveyed by deed of gift in 1956. Id. at 348-56. Until that later conveyance, the papers had been entirely closed to public access. Id.
 
 3. PRESIDENT JEFFERSON:
 
 77
 Upon his death, President Jefferson bequeathed his papers to his grandson, Thomas Jefferson Randolph. WILLS at 40. Mr. Randolph subsequently sold the majority of the papers to the United States for $20,000. Act of Aug. 12, 1848, 30th Cong., 1st Sess., IX Stat. 284, Ch. 166. However, parts of the collection remained in private hands. INDEX TO PRESIDENTIAL PAPERS OF THOMAS JEFFERSON at x. For example, the original document authorizing Robert Livingston, Minister to France, to make the Louisiana Purchase was not a part of the 1848 Congressional acquisition, but passed within the family, and was eventually sold to the Museum of the City of New York in the 1940s. Lyman H. Butterfield, The Papers of Thomas Jefferson: Progress and Procedures in the Enterprise in Princeton, 12 THE AMERICAN ARCHIVIST 141 (Apr.1949). The Library of Congress continued to collect portions of the papers in separate transactions as late as 1922. INDEX TO PRESIDENTIAL PAPERS OF THOMAS JEFFERSON at x.
 
 4. PRESIDENT MADISON:
 
 78
 During the years after his retirement from the Presidency, Madison gave selections from his presidential papers to family members for mementos. INDEX TO PRESIDENTIAL PAPERS OF JAMES MADISON at v. Upon his death on June 28, 1836, President Madison's papers descended to his widow, Dolley Madison. WILLS at 45. In 1848, having dissipated most of the Madison estate and nearly destitute, Mrs. Madison arranged to sell "all of the unpublished manuscript papers of the said James Madison now belonging to and in her possession" to the United States for $25,000. See Act of May 31, 1848, 30th Cong., 1st Sess., IX Stat. 235, Ch. 52 (appropriating $25,000 for the purchase); see also WILLS at 48 (Dolley Madison's financial condition tenuous). After the conveyance was complete, it became apparent that Mrs. Madison had withheld a significant portion of the President's materials. Mrs. Madison explained in a letter to the Secretary of State that she construed the terms of the purchase to comprehend only those papers written by the President himself. OFFICIAL OPINIONS OF THE ATTORNEYS GENERAL 104-08 (C.C. Andrews ed. 1856) (Opinion of Attorney General Caleb Cushing, Apr. 14, 1855). The materials that she retained, consisting primarily of correspondence written to the President, she bequeathed to her son, Payne Todd, who ultimately sold the papers to Mr. James C. McGuire. Id.
 
 
 79
 By 1855, Congress still had not been able to acquire the balance of the Madison papers; so it inquired of the Attorney General as to whether there was some way the United States might assert [298 U.S.App.D.C. 269] legal title to the materials. Id. In his formal opinion, Attorney General Caleb Cushing concluded that the contract with Dolley Madison was valid, that its terms had been specifically fulfilled and that legal title rested in Mr. McGuire--the United States having no prior claim to the papers. Id. Congress thereafter authorized the Library of Congress to purchase the remainder of the Madison papers. Resume of Presidential Papers at 39.
 
 5. PRESIDENT MONROE:
 
 80
 President Monroe's financial outlook was bleak following his retirement. He planned to use his presidential papers as a basis for several books, including an autobiography, in the hope that the profits from these ventures would abate his financial difficulties. INDEX TO PRESIDENTIAL PAPERS OF JAMES MONROE at v. None of these projects was complete, however, when the President's health began to decline and he was forced to move in with his daughter, Maria, and her husband, Samuel L. Gouverneur. Id. On July 4th, 1831, President Monroe died, having bequeathed his papers to Mr. Gouverneur. WILLS at 51.
 
 
 81
 In his will, President Monroe instructed Mr. Gouverneur to see to the publication of his papers and to divide the profits from such publication between himself and the President's two daughters. Id. However, the task proved too much for Mr. Gouverneur, and in 1849 he petitioned the United States Senate for assistance. Petition of Samuel L. Gouverneur, Misc. No. 10, 30th Cong., 2d Sess. (Jan. 3, 1849). The United States purchased the papers from Mr. Gouverneur for $20,000. Act of March 3, 1849, 30th Cong., 2d Sess., IX Stat. 370, Ch. 100. The purchase, though, was limited to those papers that Mr. Gouverneur deemed of a public character. INDEX TO PRESIDENTIAL PAPERS OF JAMES MONROE of ix-x; The Congressional Globe, 30th Cong. 2d Sess., 613 (Feb. 27, 1849). Samuel Gouverneur retained a large collection of documents that passed through his heirs, some of which remain in private hands. INDEX TO PRESIDENTIAL PAPERS OF JAMES MONROE at ix-x.
 
 6. PRESIDENT JOHN QUINCY ADAMS:
 
 82
 Like his father before him, John Quincy Adams removed all of his papers to the family library in Massachusetts upon the completion of his term as President. Resume of Presidential Papers at 39. In 1905, the family transferred the collection to the Massachusetts Historical Society, to which the papers were conveyed by deed of gift in 1956. Butterfield, supra, at 356. Until that later conveyance, the papers had been entirely closed to public access. Id. at 348-56.
 
 7. PRESIDENT JACKSON:
 
 83
 Shortly before his death, President Jackson wrote to Amos Kendall, formerly the Post Master General, instructing that, "on the subject of my papers--you are to retain them so long as you think necessary to use them--should you die they are to pass forthwith into Mr. [Francis P.] Blair's hands." Letter from Jackson to Kendall (May 20, 1845), quoted in INDEX TO PRESIDENTIAL PAPERS OF ANDREW JACKSON at v. Apparently, Jackson's intent was for Kendall to produce an authorized biography using the materials. However, in his instructions to Kendall, Jackson also wrote, "[t]hese papers are submitted to you in the fullest confidence in your talents and honour, that all that you may not use will be kept and restored to my adopted son A. Jackson Jr." Letter from Jackson to Kendall (Jan. 10, 1843), quoted in INDEX TO PRESIDENTIAL PAPERS OF ANDREW JACKSON at xiv.
 
 
 84
 Because Jackson gave not only Kendall, but others as well, conflicting signals regarding the use and disposition of his presidential papers, and because of the President's own cavalier attitude about the materials, Jackson's presidential papers became widely scattered after his death. INDEX TO PRESIDENTIAL PAPERS OF ANDREW JACKSON at v. Consequently, it has taken the government over one hundred separate acquisitions to obtain [298 U.S.App.D.C. 270] its current collection of Jackson papers. Carl McGowan, Presidents and Their Papers, 68 MINN.L.REV. 409, 411 (1983). In 1884, the Senate passed a resolution to purchase the collection then owned by the Jackson heirs. 15 CONG.REC. 1480, 48th Cong., 1st Sess. (Feb. 29, 1884). Most of the papers, though, were still in the possession of the descendants of Francis Blair. Thus, the Jackson heirs brought a suit in equity for the return of the materials. Jackson v. Blair, No. 9336, in equity (D.C.Sup.Ct.1884). The Blairs' defense was that the papers were "a gift and bequest ... absolute in all respects." Id. at Point 8 of Blair's Joint Answer. The case was dismissed with prejudice on Oct. 29, 1890. Id. (Decree dismissing Bill with costs).
 
 
 85
 The United States eventually acquired a substantial portion of Jackson's papers when the Blair family donated those in its possession to the Library of Congress in 1903. INDEX TO PRESIDENTIAL PAPERS OF ANDREW JACKSON at xxii. Subsequently, in 1911, the Jackson heirs sold a large volume of the President's papers then in their possession to the Library. Id. at 23. Finally, in 1932, a large set of papers were acquired from a private dealer who never revealed the original owner, though they are thought to be the "Kendall papers" once believed destroyed in an 1834 warehouse fire. Id. The two largest purchases cost the United States $18,000. Resume of Presidential Papers at 40.
 
 8. PRESIDENT VAN BUREN:
 
 86
 President Van Buren apparently had so little regard for the historic value of his presidential papers that he destroyed incoming correspondence while he was still the Chief Executive. HANDLING OF PRESIDENTIAL RECORDS at 16. Following his term in office, the President began sorting and selecting papers to archive, reportedly burning those he did not wish to keep. Resume of Presidential Papers at 40. After his death in 1862, his family continued this process, though they donated the remainder of the collection to the Library of Congress in 1904-05. Id.
 
 9. PRESIDENT WILLIAM HENRY HARRISON:
 
 87
 The home of William Henry Harrison was accidentally destroyed by fire in 1858, consuming whatever papers existed from the President's brief term in the White House. McGowan, supra, at 412.
 
 10. PRESIDENT TYLER:
 
 88
 President Tyler bequeathed his papers to his son and two sons-in-law "for revision and publication." WILLS at 88. Unfortunately, the Civil War interrupted this process and the papers became scattered during the conflict. HANDLING OF PRESIDENTIAL RECORDS at 14. A large portion of the collection was taken to Richmond, where it was accidentally burned in the great Richmond fire of April, 1865. Id.
 
 
 89
 The remainder of the presidental papers was left at the Tyler home, which was ransacked by Union soldiers several times during the course of the War. MASON WHITING TYLER, RECOLLECTIONS OF THE CIVIL WAR 217 (1912); Stephen Farnum Peckham, An Echo from the Civil War, 5 J. OF AM. HIST. 611, 613 (Oct. 1911). The papers that could be reassembled after the War by the President's son were sold to the Library of Congress in 1919 for $1,000. Resume of Presidential Papers at 40.
 
 11. PRESIDENT POLK:
 
 90
 Upon his death, President Polk's White House papers passed to his Widow. Memorandum of Worthington Ford, Chief of Manuscript Division, Library of Congress, to Librarian of Congress (Dec. 5, 1903), reprinted in J.A. at 327. She subsequently passed those papers by testamentary gift to her niece (and adopted daughter), Mrs. George W. Fall. Id. In 1903, the Library of Congress was able to prevail upon Mrs. Fall to part with most of the collection for $10,000. Draft Letter from Acting Librarian of Congress to Mrs. George W. Fall (Dec. 1, 1903).
 
 
 91
 [298 U.S.App.D.C. 271] Prior to the purchase, the Chief of the Manuscripts Division at the Library wrote to Mrs. Fall reminding her that "an essential part of the transaction is the legal evidence bearing upon your ownership of the papers." Letter from Worthington Ford to Mrs. Fall (Dec. 5, 1903), reprinted in J.A. at 326. Upon reviewing the two testamentary transfers of the papers, the Chief wrote to the Librarian of Congress: "The evidence as to ownership [in Mrs. Fall] is perfectly clear.... I ... believe that the matter has been so conducted that the Library would have a clear title...." Ford Memorandum, supra. Another small group of President Polk's papers was sold by Mrs. Fall to the Chicago Historical Society, from which the Library of Congress was able to purchase them for $3,500. Resume of Presidential Papers at 41.
 
 12. PRESIDENT TAYLOR:
 
 92
 President Taylor died while in office, apparently without having made provision for the disposition of his presidential papers. Most of them were shipped to his son, Richard Taylor, in St. Charles Parish, Louisiana. INDEX TO PRESIDENTIAL PAPERS OF ZACHARY TAYLOR at v. Richard Taylor was a Major General in the Confederate Army. When the town fell to Union forces, the home and everything in it was destroyed. Letter from Betty Taylor Bliss Dandrige, the President's daughter, to Gaillard Hunt, Chief of Manuscripts Division, Library of Congress (Jan. 19, 1909), quoted in INDEX TO PRESIDENTIAL PAPERS OF ZACHERY TAYLOR at v. Of those papers that survived the war, a few have been given to the Library of Congress. Resume of Presidential Papers at 41.
 
 13. PRESIDENT FILLMORE:
 
 93
 Among antebellum Presidents, Millard Fillmore was one of the more conscientious collectors of presidential materials. WILLS at 103 ("[I have collected] every important letter and document I received during my Administration, and which will enable the future historian or biographer to prepare an authentic account of that period of our country's history."). However, he made no provision for the preservation of his presidential papers after his death, instead bequeathing them to his son who, for unknown reasons, directed in his own will that all the papers from his father's administration be destroyed. HANDLING OF PRESIDENTIAL RECORDS at 16. In 1889, a group of these papers was destroyed, but a few survived, later to be discovered in a Buffalo, New York attic. This extant group remains today at the Buffalo Historical Society. Resume of Presidential Papers at 41.
 
 14. PRESIDENT PIERCE:
 
 94
 By all accounts, President Pierce destroyed virtually all of his presidential papers. McGowan, supra, at 412. The minuscule collection that exists today at the Library of Congress consists of copies found in the files of other government departments and a small collection sold to the Library by Kirk Pierce, the President's nephew. Resume of Presidential Papers at 41; INDEX TO PRESIDENTIAL PAPERS OF FRANKLIN PIERCE at v.
 
 15. PRESIDENT BUCHANAN:
 
 95
 Like President Fillmore, President Buchanan was assiduous in collecting every document "that came into his hands." Resume of Presidential Papers at 41. The Buchanan collection is preserved today at the Historical Society of Pennsylvania in Philadelphia. Id. The intervening history of these materials is unclear, but there is nothing in the joint submissions of the parties or in the historical record available to the court that suggests that President Buchanan viewed these documents as other than his own property.
 
 16. PRESIDENT LINCOLN:
 
 96
 Immediately after the President's assassination, the President's son, Robert Todd Lincoln, asked Justice David Davis to administer the estate. David C. Mearns, THE LINCOLN PAPERS (1948). Mr. [298 U.S.App.D.C. 272] Justice Davis had the papers shipped to Bloomington, Illinois and sealed in a bank vault under strict access restrictions. Id. Years later, the President's son went through the documents, destroyed what he deemed of little value and deposited the remainder in the Library of Congress. McGowan, supra, at 412. The Library accepted the gift pursuant to very restrictive terms, including a provision that required the papers to remain sealed from public access (which they were until 1947). Broderick Affidavit at 8-9.
 
 17. PRESIDENT ANDREW JOHNSON:
 
 97
 President Johnson was the first to systematize the filing of documents in the White House files and, consequently, his papers represent one of the most complete historical collections of the nineteenth century presidents. Id. at 10. Nonetheless, when he left office in 1869, President Johnson, like other Presidents before him, took with him every document contained in the White House files. Id. The collection subsequently passed to his heirs, who sold it in its entirety to the Library of Congress for $7,500. Resume of Presidential Papers at 42.
 
 18. PRESIDENT GRANT:
 
 98
 Although the records of President Grant's military campaigns are voluminous, not nearly as much has survived from his years as the Chief executive. Id. at 42. Contemporaneous records indicate that President Grant was not a prolific letter writer, and, after leaving the White House, President Grant either destroyed or otherwise disposed of a large portion of the correspondence he received during his years as President. Id. He did, however, rely upon his papers in assembling his memoirs, considered one of the most complete accounts of the era and a publishing triumph, selling over 600,000 copies within four years of publication. INDEX TO PRESIDENTIAL PAPERS OF ULYSSES GRANT at ix. The papers that the President did collect passed through his heirs to Ulysses S. Grant III, who then donated the majority to the Library of Congress. Resume of Presidential Papers at 42.
 
 19. PRESIDENT HAYES:
 
 99
 The papers of Rutherford B. Hayes now reside at the Hayes Memorial Library on the site of the President's home in Tremont, Ohio. Id. The papers were donated to the library by the President's son, Colonel Webb C. Hayes. Id. Nothing in the joint submissions of the parties or in the historical record available to the court suggests that the President considered the papers public property.
 
 20. PRESIDENT GARFIELD:
 
 100
 President Garfield reputedly destroyed many of his personal and political records between the time he was struck by an assassin's bullet on July 2, 1881, and the day he finally succumbed on September 19, 1881. HANDLING OF PRESIDENTIAL RECORDS at 15. After his death, his children presented what remained of the presidential papers to the Library of Congress. Resume of Presidential Papers at 42.
 
 21. PRESIDENT ARTHUR:
 
 101
 The mysterious disappearance of President Arthur's papers was solved when the President's grandson wrote to the Chief of the Manuscript Division informing him that President Arthur had "caused to be burned three large garbage cans, each at least four feet high, full of papers which I am sure would have thrown much light on history." Letter from Chester Arthur III to Thomas P. Martin (Apr. 15, 1938). Nonetheless, a small collection of Arthur's papers survived and ultimately passed to his grandson, who later sold them to the Library of Congress for $7,500. Letter from L. Quincy Mumford, Librarian of Congress to Chester Arthur III (July 8, 1958).[298 U.S.App.D.C. 273] 22. PRESIDENT CLEVELAND:
 
 
 102
 President Cleveland apparently had little interest in preserving a record of either of his discontinuous terms as President. HANDLING OF PRESIDENTIAL RECORDS at 17. His files were inconsistently kept, and many of the papers that would have been part of his collection were widely dispersed by the President among those seeking presidential memorabilia. Id. at 18. The papers that were not so disposed of were eventually donated to the Library of Congress by the President's widow. Resume of Presidential Papers at 43.
 
 23. PRESIDENT BENJAMIN HARRISON:
 
 103
 Benjamin Harrison's papers passed to his widow, who deposited the collection in the Library of Congress in 1915 on the condition that access would only be granted with her permission. INDEX TO PRESIDENTIAL PAPERS OF BENJAMIN HARRISON at v. The deposit was converted to a gift on June 2, 1933. Id.
 
 24. PRESIDENT MCKINLEY:
 
 104
 President McKinley's papers were administered after his death by his former secretary and executor, George B. Cortelyou, Broderick Affidavit at 12-13, who had been entrusted with that responsibility by the President's widow and his co-executor (Mr. Justice Day). Letter from George Cortelyou to Worthington Ford (Mar. 25, 1905). He initially deposited the papers with the Library of Congress pursuant to strict access restrictions. Broderick Affidavit, supra. After his death, Mr. Cortelyou's family continued the access restrictions until 1954 when George Cortelyou, Jr. converted the deposit to an outright gift. Id. at 14.
 
 25. PRESIDENT THEODORE ROOSEVELT:
 
 105
 In 1916, five years after leaving office, President Roosevelt deposited a portion of his papers in the Library of Congress. Id. at 16. The deposit was not, however, without substantial access restrictions. Id. at 15. Indeed, there was no doubt that Mr. Roosevelt retained complete control over the disposition of the papers. In accepting the deposit, the Librarian wrote to Mr. Roosevelt: "a packer will call at Oyster Bay to have indicated to him what papers you are willing to transfer to the Library's custody...." Letter from Herbert Putnam, Librarian of Congress, to President Roosevelt (Dec. 22, 1916), reprinted in J.A. at 371. After the President's death, the Roosevelt family made several contributions to substantially complete the collection. Resume of Presidential Papers at 43.
 
 26. PRESIDENT TAFT:
 
 106
 Like Theodore Roosevelt, President Taft began depositing his papers with the Library of Congress soon after leaving office. Kate MacLean Stewart, The William Howard Taft Papers, 15 LIBR. OF CONG. Q. CURRENT ACQUISITIONS S 4 (Nov. 1957). However, the deposit was made upon condition that no one would have access to the materials without permission from the Taft family. HANDLING OF PRESIDENTIAL RECORDS at 18. After the President's death, his widow made later deposits subject to the same restriction and "retained ownership and control" of the papers. Id. The Library adhered to these restrictions until it "acquired legal title" to the papers in 1952 when the family made a deed of gift to the Library. Stewart, supra, at 5.
 
 27. PRESIDENT WILSON:
 
 107
 While the President was yet in office, the Library of Congress began soliciting him for his presidential papers. Letter from Charles Moore, Acting Chief of Manuscript Division, Library of Congress, to President Wilson (Oct. 29, 1920), reprinted in J.A. at 380-81. In declining to deposit the papers, the President wrote that he preferred to dispose of the papers through "my last will and testament." Letter from President Wilson to Charles Moore (Apr. 12, 1922), reprinted in J.A. at 385. Within weeks of his death, the Librarian began soliciting Mrs. Wilson for the President's papers, assuring her that the Library [298 U.S.App.D.C. 274] would honor any conditions that she might impose upon the deposit. Letter from Charles Moore to Mrs. Wilson (Feb. 20, 1924), reprinted in J.A. at 386-87. Mrs. Wilson declined, but the Library persisted and five years later the Chief of the Manuscripts Division again wrote the President's widow. In this letter, the Chief wrote, "deposits are apt to produce awkward situations at later dates, as when, after the lifetime of the depositor, it becomes uncertain, possibly disputable, who has by succession the right to withdraw or control. Gift works much better--meaning gift with whatever conditions expressed and agreed upon ... [which] would be observed with rigid care." Letter from Franklin Jameson, Chief of Manuscript Division, Library of Congress, to Mrs. Wilson (Apr. 1, 1929), reprinted in J.A. at 389-92. In 1929, Mrs. Wilson agreed to deposit the President's White House papers with the Library, subject to access restrictions. Letter from Mrs. Wilson to Franklin Jameson (Apr. 22, 1929), reprinted in J.A. at 393-95.
 
 28. PRESIDENT HARDING:
 
 108
 Following President Harding's death, his private secretary was directed to pack his official papers and send them on to Marion, Ohio. INDEX TO PRESIDENTIAL PAPERS OF WARREN HARDING at iv-v. Instead, he boxed the materials from the central files and stored them in the basement of the White House. Id. Meanwhile, the President's widow collected the vast majority of his remaining papers and destroyed them. Id. Mrs. Harding died on Nov. 21, 1924 having directed in her will that all of the papers of President Harding or hers were to go to the Harding Memorial Association. Id. at vi.
 
 
 109
 In July, 1929, workmen discovered the collection of Harding materials in the basement of the White House and the Library of Congress was tasked with handling the new found treasure. Id. at vii. J. Franklin Jameson, Chief of the Manuscript Division sent the papers on to the Harding Memorial Association in strict compliance with the will of Mrs. Warren G. Harding. Id. The papers remained closed to the public until the Association donated them to the Ohio Historical Society on Oct. 8, 1963. Id. at ix.
 
 29. PRESIDENT COOLIDGE:
 
 110
 Just as President Coolidge's term ended, the Chief of the Manuscript Division wrote him requesting his presidential papers. In the letter, the Chief wrote: "My understanding is that it is entirely for you to say what shall be done with [the papers], the White House having no claim." Letter from Chief of Manuscript Division to President Coolidge (May 6, 1929). President Coolidge needed no convincing and soon began systematically destroying most of his presidential papers. Memorandum for the Record of Fred Shelley, Head, Presidential Papers Section, Library of Congress, (Mar. 3, 1959) (memorializing a conversation with Mrs. Coolidge).
 
 
 111
 In 1929, Coolidge deposited with the Library some relatively unimportant papers that still remained in the President's possession. Haynes, supra, at 17-18. The deposit was made pursuant to access restrictions, which continued until 1953 when the President's widow converted the deposit to a gift. Mrs. Calvin Coolidge, Instrument of Gift of Coolidge papers to the Library of Congress (Mar. 24, 1953), reprinted in J.A. at 408.
 
 30. PRESIDENT HOOVER:
 
 112
 President Hoover removed and retained a large collection of papers when he left the White House in 1933. See Letter from President Hoover to Franklin Floete, Administrator of General Services (Dec. 15, 1960), reprinted in J.A. at 555. Later, through private subscription, a Presidential Library was built to house these documents. Id. In 1960, President Hoover donated the library and his presidential papers to the United States on condition that the library be maintained by the government as such and that certain access restrictions were respected. Id. President Hoover also [298 U.S.App.D.C. 275] made it clear in his gift that he retained the right to withhold any documents or materials he chose "by reason of private or personal interest." Id. at 2.
 
 31. PRESIDENT FRANKLIN ROOSEVELT:
 
 113
 In describing the completeness of his papers, President Roosevelt said, "I have destroyed practically nothing." Resume of Presidential Papers at 44. Since the President died in office, no arrangements had been made for the disposition of his papers. Affidavit of William F. Hopkins, Senior Executive Clerk, White House Office, 1948-1971 (July 1, 1973), reprinted in J.A. at 494. Consequently, they were hurriedly boxed and taken to the National Archives, where they remained under the care of the President's private secretary, Grace Tully, until the Roosevelt Presidential Library was completed in Hyde Park, New York. Id. The only papers that were not immediately removed from the White House were the famous "Map Room papers" relating to the conduct and conclusion of World War II, which President Truman continued to use. The FDR Library and papers were ultimately donated to the United States. See Memorandum for the Director of the Franklin D. Roosevelt Library from Franklin D. Roosevelt (July 16, 1943), reprinted in J.A. at 574.
 
 32. PRESIDENT TRUMAN:
 
 114
 Prior to leaving office, President Truman expressed his intention to donate his papers to the United States. Letter from Harry S. Truman to Mr. J. Larson, Administrator of General Services (Jan. 17, 1953), reprinted in J.A. at 575-76. Nonetheless, the President followed the tradition of every previous President and removed all of his files from the White House at the end of his term. Affidavit of William F. Mathews, Chief of White House Central Files Unit, 1975, at 4, reprinted in J.A. at 464. This material was shipped to a location of the President's choosing in Missouri, where he began culling out the material over which he wished to retain control. Hopkins Affidavit at 10. In 1957, the President reached an agreement with the Administrator of General Services to donate the bulk of his papers to the United States pursuant to the Presidential Libraries Act. Letter from Franklin Floete to Harry S. Truman (Mar. 1, 1957), reprinted in J.A. at 590. The remainder he bequeathed to the United States. WILLS at 215.
 
 33. PRESIDENT EISENHOWER:
 
 115
 At the end of his term, President Eisenhower had some of his White House files shipped to Gettysburg, Pennsylvania, and the balance sent to Abilene, Kansas. Mathews Affidavit at 4. The only material President Eisenhower left for the incoming President was a "satchel containing a series of orders and instruction to be of assistance in the event of nuclear attack or other national crisis." Affidavit of John S.D. Eisenhower at 6 (June 30, 1975).
 
 
 116
 There is no mistaking the fact that President Eisenhower regarded his presidential materials as his own. In his letter offering the papers to the United States, President Eisenhower wrote: "The papers of a President, which from the time of George Washington have been regarded as the personal property of the President...." Letter from Dwight D. Eisenhower to Franklin Floete (Apr. 13, 1960), reprinted in J.A. at 604. At his death, General Eisenhower bequeathed his papers to the United States subject to the terms and conditions set forth in his letter to the Administrator. WILLS at 238.
 
 34. PRESIDENT KENNEDY:
 
 117
 Because of his untimely death, President Kennedy did not have an opportunity to make extensive arrangements for the disposition of his White House papers. Following the Franklin Roosevelt precedent, President Kennedy's files were boxed and shipped to the National Archives pending the completion of a Presidential Library. Mathews Affidavit at 5. Eventually, President Kennedy's [298 U.S.App.D.C. 276] representatives (Jacqueline Kennedy and Senator Edward Kennedy) did enter into a library agreement, reserving the right to limit access and the right to unilaterally withhold any materials they chose. Letter of Jacqueline B. Kennedy to Bernard L. Boutin, Administrator of General Services (Feb. 25, 1965), reprinted in J.A. at 621-27; Letter of Transmittal to James B. Rhoads, Archivist of the United States (Apr. 20, 1965), reprinted in J.A. at 629-35.
 
 35. PRESIDENT LYNDON JOHNSON:
 
 118
 Upon President Johnson's retirement, the White House central files relating to his administration were boxed and shipped to Austin Texas for storage until the Johnson Presidential Library could be completed. Mathews Affidavit at 5. In 1965, President Johnson wrote to the Administrator of General Services offering his presidential materials in exchange for a Presidential Library. Letter from Lyndon B. Johnson to Lawson B. Knott, Jr., Administrator of General Services (Aug. 13, 1965), reprinted in J.A. at 697-701.
 
 
 119
 As in other presidential library deals, President Johnson reserved for himself the power to select the documents that would be included in the library collection, as well as the right to restrict access to certain materials. Id. Materials that had not been conveyed were transferred to the Library by specific devise in the President's last will and testament. WILLS at 267.
 
 36. PRESIDENT NIXON:
 
 120
 President Nixon's papers are the subject of the current controversy.
 
 37. PRESIDENT FORD:
 
 121
 In 1976, President Ford offered his presidential papers to the United States in exchange for a presidential library. Letter from Gerald R. Ford to James B. Rhoads and Robben W. Flemming (Dec. 13, 1976), reprinted in J.A. at 726-54. As part of the agreement, President Ford created an executory interest by which all right, title, and interest in the materials would shift to the University of Michigan if the United States failed to adhere to the conditions of donation. Id. at 2. The United States accepted the donation and the conditions. Id. at 7.
 
 38. PRESIDENT CARTER:
 
 122
 Following his defeat in the election of 1980, President Carter sought advice on the disposition of his White House papers. White House Counsel Lloyd Cutler responded: "With the exception of a special statute governing President Nixon's papers, you and all of your predecessors have been free to dispose of all papers generated and maintained by the Presidency." Memorandum from Lloyd Cutler (Nov. 13, 1980), reprinted in J.A. at 848. Days before turning over the White House to President Reagan, President Carter wrote to the Archivist of the United States:
 
 
 123
 I am committed to assuring public ownership and permanent preservation of historical materials documenting my Presidency. I have long planned to donate my Presidential papers to the Government for eventual deposit in a Presidential archival depository to accomplish this aim.... Title to the donated materials shall pass to the United States upon acceptance of this letter of offer....
 
 
 124
 Letter from Jimmy Carter to Robert Warner, Archivist of the United States 1-2 (Jan. 31, 1981), reprinted in J.A. at 755-56. The Archivist of the United States signed the letter of acceptance on February 9, 1981. Id. at 4.
 
 39. PRESIDENT REAGAN:
 
 125
 President Reagan's presidential papers are subject to the Presidential Records Act of 1978 which prospectively abolished private ownership of presidential papers. 44 U.S.C. § 2201 et seq. (1988).
 
 40. PRESIDENT BUSH:
 
 126
 President Bush's presidential papers are subject to the Presidential Records [298 U.S.App.D.C. 277] Act of 1978 which prospectively abolished private ownership of presidential papers. 44 U.S.C. § 2201 et seq. (1988).
 
 
 127
 KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:
 
 
 128
 This case comes before us after a long and tortuous procedural history well described by Judge Edwards. Because I concur on the merits, I join his opinion; nonetheless, I write separately to express my concern over the byzantine process created by Congress and the parties--a process that, after 3 separate lawsuits and 18 years of fighting, can do no more than send the Government and Mr. Nixon on to yet another phase of their dispute to face still more "difficult questions regarding the measure of damages." Maj. Op. at 1287. The dispute between Mr. Nixon and the Government over these presidential papers may well take over 20 years to resolve.
 
 
 129
 Faced with this overwhelming procedural history, the Court asked the parties why res judicata, or claim preclusion, does not bar this third lawsuit Mr. Nixon is litigating against the Government. Because the parties met our inquiry by submitting additional briefs on the issue, I feel it is incumbent upon us to address the question directly and fully.
 
 
 130
 Res judicata, or claim preclusion, is an affirmative defense designed in part to protect a defendant from repetitive, vexatious litigation. Ordinarily a defendant's failure to raise it at the pleadings stage results in a waiver of the defense. See Fed.R.Civ.P. 8(c) (listing res judicata as an affirmative defense); 12(b), 15 (indicating that defenses not asserted in the answer or amendments thereto are waived). Because the res judicata defense also rests on the need to conserve judicial resources, however, some trial courts have indicated a willingness to raise the issue sua sponte and these decisions have been sustained. See, e.g., Holloway Constr. Co. v. U.S. Dep't of Labor, 891 F.2d 1211, 1212 (6th Cir.1989) (affirming sua sponte application by district court); McClain v. Apodaca, 793 F.2d 1031, 1033 (9th Cir.1986) (affirming sua sponte application by bankruptcy court); Gullo v. Veterans Coop. Housing Ass'n, 269 F.2d 517 (D.C.Cir.1959) (affirming sua sponte application by district court).
 
 
 131
 The circuits are split on the question whether an appellate court may, for the first time, raise the issue sua sponte. The Fifth and Sixth Circuits and the Court of Claims have held that an appellate court may consider the issue on its own initiative. See American Furniture Co. v. International Accommodations Supply, 721 F.2d 478, 482 (5th Cir. Unit A March, 1981); Lesher v. Lavrich, 784 F.2d 193, 195-96 (6th Cir.1986); Alyeska Pipeline Serv. Co. v. United States, 231 Ct.Cl. 540, 688 F.2d 765, 771 (1982). The First, Third, Fourth, Seventh and Ninth Circuits have declined to exercise such authority under the circumstances presented to them. See Badway v. United States, 367 F.2d 22, 25 (1st Cir.1966); Kane v. Heckler, 776 F.2d 1130, 1132 (3d Cir.1985); Crowe v. Cherokee Wonderland, Inc., 379 F.2d 51, 54 (4th Cir.1967); Marcus v. Sullivan, 926 F.2d 604, 615-16 (7th Cir.1991); Kern Oil & Ref. Co. v. Tenneco Oil Co., 840 F.2d 730, 735 (9th Cir.1988).
 
 
 132
 Despite Mr. Nixon's contentions to the contrary, this circuit has not addressed the question directly. Mr. Nixon asserts that we laid down a strict rule that res judicata must be affirmatively raised in Poulin v. Bowen, 817 F.2d 865, 869 (D.C.Cir.1987). But in that case, we did no more than state that parties waive their own right to raise res judicata by failing to plead it.[1] Id. Thus, the question whether this court may raise res judicata sua sponte in appropriate circumstances is, at least in my opinion, an open one.
 
 
 133
 [298 U.S.App.D.C. 278] Despite the long pedigree of this case and despite the fact that any attempt to set compensation for Mr. Nixon may consume judicial resources for several more years, application of res judicata here would be fundamentally unfair. To apply res judicata, the litigants or their privies must have had a full and fair opportunity to raise the claim in an earlier proceeding. North v. Walsh, 881 F.2d 1088, 1095 (D.C.Cir.1989); Clark-Cowlitz Joint Operating Agency v. F.E.R.C., 826 F.2d 1074, 1079 (D.C.Cir.1987). Moreover, the challenged claim must flow from the same claim or cause of action as the claim presented in the earlier proceeding. The definition of a common "cause of action" is imprecise and varies with the facts presented, and this Court has adopted a transactional approach to the issue. See I.A.M. Nat'l Pension Fund, Benefit Plan A v. Industrial Gear Mfg. Co., 723 F.2d 944, 947 (D.C.Cir.1983); U.S. Indus., Inc. v. Blake Constr. Co., 765 F.2d 195, 205 (D.C.Cir.1985). Considerations such as whether the facts giving rise to the former proceeding and the current claim are related in time, space, origin or motivation, whether the claims form a convenient trial unit and whether the parties expected the claims to be treated as a unit are all relevant to the determination whether the claims arise out of the same general cause of action. U.S. Indus., 765 F.2d at 205.
 
 
 134
 Here, these considerations are absent. Mr. Nixon's first litigation did not provide him with a full and fair opportunity to litigate the takings claim. In an order dated May 1, 1975, the district court limited itself to a consideration of the propriety of injunctive relief against the alleged facial unconstitutionality of the PRMPA. Nixon v. Administrator of Gen. Servs., 408 F.Supp. 321, 335 (D.D.C.1976). On review, the Supreme Court indicated that the takings issue remained unresolved. Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 445 n. 8, 97 S.Ct. 2777, 2791 n. 8, 53 L.Ed.2d 867 (1977). Significantly, during the entire course of litigation, the Government also adopted the position that Mr. Nixon's takings claim should be addressed in a separate compensation action under PRMPA. See Supreme Court Br. for Fed. Appellees at 45, Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); P. & A. in Supp. of Def's Mot. to Dismiss 8, 10 (filed Aug. 15, 1977), Nixon v. Sampson, 389 F.Supp. 107 (D.D.C.1975), dismissed, 437 F.Supp. 654 (D.D.C.1977). Having consistently adopted that stance to the present, the Government may not now rely on Nixon v. Administrator of Gen. Servs. as a basis for res judicata. Thus, Mr. Nixon had no full and fair opportunity to litigate the takings issue in his first lawsuit.
 
 
 135
 It is equally inappropriate to apply res judicata based on Nixon v. Freeman, 670 F.2d 346 (D.C.Cir.1982), in which Mr. Nixon challenged the PRMPA regulations. First, it is not at all clear that Freeman was privy with the United States, the party liable for compensation based on a taking. Second, the record manifests that the parties did not contemplate that the takings issue would be litigated together with the challenge to the regulations. In fact, after Mr. Nixon filed his current complaint, the Government challenged some of the claims based on res judicata. But the government elected not to raise res judicata regarding Mr. Nixon's takings claim. Answer, United States, March 4, 1981 (J.A. at 23). Finally, because any takings challenge would have required the development of an extensive and unique record tracing presidential practices back to George Washington, it is not clear that this issue would have formed a "convenient trial unit" if it had been brought with the challenge to the regulations. Given the cumulative weight of these considerations, it would be unfair to apply res judicata to Mr. Nixon's claim on the basis of his second lawsuit.
 
 
 136
 If the Government had raised res judicata when Mr. Nixon first filed this lawsuit, it is possible, although not definite, that the outcome would be different. Taking into account the Government's failure to assert the defense and the considerations discussed above, however, I feel it would be unfair for us sua sponte to apply res judicata to Mr. Nixon's claim at this time.
 
 
 137
 [298 U.S.App.D.C. 279] In summary, I believe Judge Edwards rightly addresses the merits of the case and I concur in his persuasive opinion. Although no one is happy about the prospect of additional litigation between Mr. Nixon and the Government, it is necessary to ensure that Mr. Nixon, like all citizens, receives the constitutional protections to which he is entitled. The case requires a remand to the district court to set compensation for the Government's taking of Mr. Nixon's presidential papers.
 
 
 
 [1]
 The so-called "presidential papers" include the various documents, tapes and other materials described in the "Background" section of this opinion
 
 
 [2]
 Amendment V (1791)
 No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.
 
 
 [3]
 The White House Office is an administrative office consisting of the President and his staff
 
 
 [4]
 These documents were kept in either the "central files," which housed materials relating to the general affairs of the Office, or the "special files," which housed documents containing the President's own handwriting or were otherwise considered the most confidential
 
 
 [5]
 A less sophisticated system had been used by President Johnson to record his telephone calls and meetings. Mr. Nixon had that system dismantled and did not replace it until February of 1971
 
 
 [6]
 This collection is estimated to contain some forty-two million articles. Nixon v. Administrator of General Services, 433 U.S. 425, 430, 97 S.Ct. 2777, 2784, 53 L.Ed.2d 867 (1977)
 
 
 [7]
 Hereinafter the "Nixon-Sampson agreement." This agreement was entered into under the authority of the Presidential Libraries Act, Pub.L. No. 84-373, 69 Stat. 695 (1955), 44 U.S.C. § 2107 (recodified as amended at 44 U.S.C. § 2111). Under this Act, the Administrator was authorized to accept for deposit presidential papers subject to any restrictions specified by the depositor
 
 
 [8]
 The Act was amended in 1984 to substitute the Archivist of the United States for the Administrator. Pub.L. No. 98-497, title I, § 107(c)(1), 98 Stat. 2291 (1984)
 
 
 [9]
 "Presidential historical materials" are defined in the Act as objects or materials having "historical or commemorative value." 44 U.S.C. § 2101(2) (1988)
 
 
 [10]
 The regulations were to take into account the following factors:
 (1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate';
 (2) the need to make such recordings and materials available for use in judicial proceedings;
 (3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;
 (4) the need to protect every individual's right to a fair and impartial trial;
 (5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;
 (6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and
 (7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.
 PRMPA § 104(a).
 
 
 [11]
 Under the regulations, "general historical significance" has a more narrow meaning than under the statute and is confined to those materials "having administrative, legal, research or other historical value as evidence of or information about the constitutional or statutory powers or duties of the President, which an archivist has determined to be of a quality sufficient to warrant ... retention." 36 C.F.R. § 1275.16(d). Private or personal materials subject to return are defined to include only "those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other non-governmental activities, including private political associations, and having no connection with his constitutional or statutory powers or duties as President." Id. at § 1275.16(b). The application of these standards to particular materials is the subject of ongoing archival processing
 
 
 [12]
 This case was consolidated with two other pending actions, one brought by the Reporters Committee for Freedom of the Press, et al. (Civil Action No. 74-1533) and the other brought by Lillian Hellman, et al. (Civil Action No. 74-1551). 389 F.Supp. at 114. Both of the other plaintiffs sought access to the presidential materials through the Freedom of Information Act, 5 U.S.C. § 552 et seq. (1988)
 
 
 [13]
 The three-judge court was comprised of McGowan and Tamm, Circuit Judges, and District Judge Robinson. The opinion for the court was filed by Judge McGowan. Nixon v. Administrator of General Services, 408 F.Supp. 321, 329 (D.D.C.1976)
 
 
 [14]
 Mr. Nixon asserted a variety of constitutional challenges to the Act itself. In response, the Supreme Court held: (1) The Act did not violate the principle of separation of powers; (2) the Act did not impinge upon Presidential Privileges; (3) the Act did not invade Mr. Nixon's privacy rights; (4) the Act did not unconstitutionally interfere with Mr. Nixon's rights of free association; and (5) the Act was not a Bill of Attainder. Nixon v. Administrator, 433 U.S. at 425, 97 S.Ct. at 2781
 
 
 [15]
 Shortly after the Supreme Court's decision in Nixon v. Administrator, the District Court dismissed Nixon v. Sampson as moot. 437 F.Supp. 654, 656 (D.D.C.1977). This judgment was reversed in Reporters Committee for Freedom of the Press v. Sampson, 591 F.2d 944, 950 (D.C.Cir.1978) (issue of ownership of presidential papers not moot). On remand, with the consent of the parties, the case was dismissed without prejudice. Since it is fundamental that there can be no res judicata under these circumstances, see G & C Merriam Co. v. Saalfield, 241 U.S. 22, 28, 36 S.Ct. 477, 480, 60 L.Ed. 868 (1916), McRae v. United States, 420 F.2d 1283, 1286 (D.C.Cir.1969), the proceedings in Sampson have no bearing on the present appeal
 
 
 [16]
 The Government did not raise the affirmative defense of res judicata based on claim splitting at any time in the proceedings below or before this court. Whatever the merits of such a claim might be, we decline to raise it sua sponte at this juncture. See Poulin v. Bowen, 817 F.2d 865, 869 (D.C.Cir.1987) (defense of res judicata waived if not pleaded as an affirmative defense)
 
 
 [17]
 "Property" has been described by scholars in a variety of ways, reflecting concerns of pragmatism, justice, social function, and philosophy. See generally Frank I. Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 HARV.L.REV. 1164 (1967)
 
 
 [18]
 It is an uncontroversial, yet often unarticulated proposition that, in the absence of constitutional, statutory or common law rules, custom and usage may identify and create contract or property rights. See, e.g., First Victoria National Bank v. United States, 620 F.2d 1096, 1103 (1st Cir.1980) ("law or custom may create property rights where none were earlier thought to exist"); see also Oliver W. Holmes, The Path of the Law, 10 HARV.L.REV. 457, 477 (1897) (defining "property" as a thing used as such over an extended period of time; "[t]he law can ask no better justification"); cf. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 543, 8 L.Ed. 483 (1832) (title based on conquest and possession); International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918) (property rights acquired by labor invested in creation); Baden v. Koch, 638 F.2d 486, 492 (2d Cir.1980) ("mutual understandings and customs could not create a property interest ... when they are contrary to express provisions of regulations and statutes") (emphasis added). Some courts have gone so far as to suggest that rights created by custom may be so robust as to trump positive law or common law. See, e.g., Swift v. Gifford, 23 Fed.Cas. 558, 559 (D.Mass.1872) ("plain and well settled rule of property" that complete possession necessary to capture a wild animal overcome by "usage" in the whaling industry that the first to strike gets the prize); Ghen v. Rich, 8 Fed. 159, 162 (D.Mass.1881) (usage in fin-back whaling industry overcomes the common law rule)
 
 
 [19]
 In 1978, Congress prospectively abolished presidential ownership of White House materials with the Presidential Records Act, 44 U.S.C. § 2201 et seq. This Act is not at issue in the present case
 
 
 [20]
 The one notable exception to this practice was the "Map Room Papers" relating to the conduct of World War II, which remained in President Truman's White House following President Roosevelt's death. See In Re Roosevelt's Will, 190 Misc. 341, 73 N.Y.S.2d 821, 825 (Sur.Ct.1947). The highly unusual circumstances of the time discount the importance of this single exception
 
 
 [21]
 See APPENDIX to this Opinion for a complete, albeit brief, account of the history of presidential papers. An extensive description is contained in a multi-volume catalogue of the Library of Congress' collection of presidential papers available at the Manuscript Division (hereinafter "INDEX TO PRESIDENTIAL PAPERS")
 
 
 [22]
 See, e.g., WILLS at 51 (President Monroe directed in his will that his son-in-law publish his papers and divide the profits between himself and the President's two daughters)
 
 
 [23]
 This gift was later upheld in Jackson v. Blair, No. 9336, in equity (D.C.Sup.Ct.1884) (case file available at the National Archives Record Center, Suitland, Maryland)
 
 
 [24]
 This gift was subsequently upheld as a valid inter vivos gift. In Re Roosevelt's Will, 73 N.Y.S.2d at 826
 
 
 [25]
 See, e.g., Letter from President Ford to James B. Rhodes, Archivist of the United States (Dec. 13, 1976) (requiring a commitment to maintain two separate facilities in order to acquire the Ford papers), reprinted in J.A. at 726, 740; id. (acceptance of James Rhodes on behalf of the United States), reprinted in J.A. at 732
 
 
 [26]
 President Coolidge's conduct is testimony to the fact that the practice of Presidential destruction was not limited to Chief Magistrates of the nineteenth century. Just as President Coolidge's term ended, the head of the Manuscript Division wrote him requesting his presidential papers. In the letter, the librarian wrote: "My understanding is that it is entirely for you to say what shall be done with [the papers], the White House having no claim." Letter from Chief of Manuscript Division to President Coolidge (May 6, 1929), reprinted in J.A. at 405. President Coolidge needed no convincing and soon began systematically destroying all of his important "personal" papers. Memorandum for the Record of Fred Shelley, Head, Presidential Papers Section, Library of Congress (Mar. 3, 1959) (memorializing a conversation with Mrs. Coolidge), reprinted in J.A. at 402. The President's private secretary recalled later that, "Mr. Coolidge's desire was to destroy everything in the so-called 'personal files' and there would have been nothing preserved if I had not taken some things out on my own responsibility." Letter from Edward Clark to Harry E. Ross, the President's last secretary (Mar. 31, 1933), quoted in John E. Haynes, The Calvin Coolidge Papers at the Library of Congress, in 8 THE REAL CALVIN COOLIDGE 18 (Aug. 5, 1990)
 
 
 [27]
 The context in which President Cleveland made these remarks is also informative. Early in his first term, the President became involved in an acrimonious dispute with the Senate regarding some suspensions of United States officers. The Senate demanded of the President the reasons for the suspensions and papers incident thereto. The President declined by letter which included the quoted observations. 8A COMPILATION OF MESSAGES AND PAPERS OF THE PRESIDENTS 1787-1877, at iv
 
 
 [28]
 A twentieth century Attorney General reached the same conclusion regarding Mr. Nixon's papers. 43 Op.Att'y Gen. 1-9 (1974) (Attorney General Saxbe opining that Mr. Nixon's papers were his personal property)
 
 
 [29]
 The argument has been made that Congress purchased these materials never having considered that they might already belong to the United States. Even if it were true that Congress proceeded so carelessly, that fact alone would speak volumes in support of Mr. Nixon's position that there existed a mutual understanding of presidential ownership. In any event, the issue was raised in 1834, while Congress debated the purchase of President Washington's papers. Representative Parker, objecting to the proposed sum, claimed that the papers were not private property. 10 CONG. DEBATE 4782 (June 26, 1834). Representative Parker's objections were to no avail
 
 
 [30]
 Section 1 of the Act reads in its entirety:
 The Librarian of Congress is authorized and directed to arrange, index, and microfilm the papers of the Presidents of the United States in the collections of the Library of Congress, in order to preserve their contents against destruction by war or other calamity and for the purpose of making them more readily available for study and research to the fullest possible extent consistent with any existing limitations that may have been imposed on the use of or the access to such papers by their donors or by those placing them on deposit with the Library of Congress.
 
 
 [31]
 When it came to implementing the Presidential Libraries Act, the House Committee on Governmental Operations expressly recognized the historical tradition. See H.R.REP. NO. 892, 89th Cong., 1st Sess. 7 (1965) (report on Johnson Library legislation) ("The papers authored and received by a President during his term of office in the White House have been historically recognized as his property, and Presidents have disposed of them as they wished.")
 
 
 [32]
 But cf. Whitney Benefits, Inc. v. United States, 926 F.2d 1169, 1172 (Fed.Cir.) (government act precluding surface mining of a particular deposit of coal a per se taking of "the right to mine"), cert. denied, --- U.S. ----, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991); Att'y Gen. Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings (June 30, 1988) (Fifth Amendment Takings Clause applies to "property interests of whatever specie--realty, personalty, or intellectual"), reprinted in J.A. at 1431
 
 
 [33]
 Mr. Nixon's right of access is subject to some regulatory control. PRMPA § 102; 36 C.F.R. § 1275.30
 
 
 [1]
 Likewise, in Taxation with Representation v. Regan, 676 F.2d 715, 717 n. 1 (D.C.Cir.1982), rev'd on other grounds, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), this court, in a footnote, declined to apply res judicata sua sponte. The court did not, however, address the question whether it had the power to apply it. In declining to invoke the power, it apparently accepted the notion that it would be able, in some circumstances, to raise res judicata sua sponte. Id